A01A2498. COLONIAL BANK v. BOULDER BANKCARD
PROCESSING, INC. et al.
A01A2499. BOULDER BANKCARD PROCESSING, INC.
v. COLONIAL BANK.
(563 SE2d 492)

PHIPPS, Judge.

Boulder Bankcard Processing, Inc. (BBP) sued Colonial Bank (Colonial) for breach of an indemnity agreement. Colonial denied liability and filed a third-party complaint against American Security Bank (ASB), contending that if it was liable to BBP, ASB was liable to it under an asset purchase agreement between it and ASB. ASB denied liability, asserting that the asset purchase agreement did not include an assumption of liability for the indemnity agreement. The trial court granted BBP summary judgment against Colonial. It also granted ASB summary judgment against Colonial on the issue of liability.

In Case No. A01A2498, Colonial appeals, contending that BBP failed to show breach of the indemnity agreement and thus contesting BBP's recovery of damages, prejudgment interest, attorney fees, and expenses. Colonial maintains that even if it breached the indemnity agreement, ASB would be liable under the asset purchase agreement. We disagree with Colonial's contentions and affirm.

In Case No. A01A2499, BBP cross-appeals, contending that the trial court erred in its calculation of prejudgment interest, attorney fees, and expenses. We affirm the award of prejudgment interest. But because the record reveals that the trial court improperly calculated the awards of attorney fees and expenses, we vacate those awards and remand for determination.

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.[1] We review a grant of summary judgment de novo and view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[2]

---

[1] OCGA § 9-11-56 (c).
[2] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

Construed in this light, the record shows that BBP provided credit card transaction processing services to merchant customers of banks who offered credit card deposit accounts to them. Colonial's predecessor, Commercial Bank of Georgia (CBG), asked BBP to take over credit card processing for the accounts of its merchant customers on an emergency basis. While BBP agreed to do so, the expedited time frame would not have permitted BBP to take the merchants through its normal credit and underwriting procedures to determine creditworthiness. BBP therefore required CBG to indemnify it for losses it could incur as a result of the immediate conversion and processing. CBG and BBP entered into an indemnity agreement.

CBG agreed to submit to BBP its account information for merchant customers. BBP agreed that upon receipt of such information, it would begin processing those merchant accounts. CBG agreed to indemnify BBP for any resulting losses and related expenses. The indemnity agreement stated that CBG's indemnity obligation terminated with the earliest of "(i) The termination of the Merchant Agreement between Merchant and BBP; (ii) BBP's approval of the Merchant's Application as provided herein; [or] (iii) BBP and [CBG] otherwise agree in writing to terminate this Indemnity."

BBP would approve a merchant's application as follows. CBG would send each merchant a standard BBP merchant processing agreement and application to complete, execute, and send back to BBP. BBP agreed in the indemnity agreement to use its "best efforts" to review each merchant application and notify CBG within ten days of receiving an application whether it had approved or declined the merchant. If BBP approved the merchant, indemnity as to that merchant terminated. If BBP declined the merchant, CBG agreed to advise BBP whether it should continue processing that merchant, apparently with continued indemnification.

The day after CBG and BBP entered into the indemnity agreement, the parties executed a letter agreement. It specified that BBP would begin processing for a merchant when it received from CBG the merchant's account information submitted on a "completed (but unexecuted) [merchant] application." Within three days of the letter agreement, CBG began submitting to BBP unexecuted merchant applications that contained account information from CBG's files for BBP's immediate conversion of the information into its computer system and processing services.

Subsequently, CBG merged into Colonial. The following month, Colonial entered into an asset purchase agreement with ASB, wherein Colonial sold its electronic banking services division (i.e., its credit card business) to ASB.

When Colonial later refused to pay BBP for alleged losses on the accounts of 15 merchants, BBP sued.

*Case No. A01A2498*

As an initial matter, we note that Colonial's brief does not comply with this court's rules.[3] Enumerated errors are grouped together and argued collectively.

> Our requirements as to the form of appellate briefs were created not to provide an obstacle, but to aid parties in presenting their arguments in a manner most likely to be fully and efficiently comprehended by this Court; a party will not be granted relief should we err in deciphering a brief which fails to adhere to the required form.[4]

1. Colonial argues that a condition precedent to indemnification of a particular merchant's account was BBP's written merchant agreement with that merchant.

Colonial points to a provision of the indemnity agreement, which, when read alone, tends to support its argument. But we interpret the indemnity agreement as a whole and find that it did not require BBP to enter into written merchant agreements as a condition precedent to indemnification.[5] To require a written merchant agreement between BBP and a merchant before BBP had the opportunity to review the merchant, as Colonial contends, would eviscerate the purpose of the indemnity agreement — to shift the risk of loss from BBP to CBG during the time between the expedited conversion and BBP's approval of a merchant.

2. Colonial contends that BBP cannot recover alleged losses for five merchant accounts because BBP failed to use its "best efforts" to notify it of approved or declined decisions.

BBP agreed that within ten days of receiving a "merchant application" it would use its best efforts to notify CBG of its decision. We interpret "merchant application," as used in this context, as the one *signed* and *sent by the merchant*, not the unexecuted merchant application that CBG used to submit initial merchant account information to BBP. It is uncontroverted that as to the five merchant accounts at issue in this contention, BBP did not receive merchant applications signed by the merchants. Therefore, BBP had no review or notification duties as to those merchants.

3. Colonial contends that there is no evidence that CBG requested BBP to provide processing services for several merchants,

---

[3] See Court of Appeals Rule 27 (c) (1).

[4] (Punctuation and footnote omitted.) *Campbell v. Breedlove*, 244 Ga. App. 819, 821 (535 SE2d 308) (2000).

[5] See generally *Thornton v. Kumar*, 240 Ga. App. 897, 898-899 (525 SE2d 735) (1999).

pointing out that in response to discovery requests, BBP failed to produce the unsigned merchant applications that it had received from CBG.

But BBP presented evidence that it began processing the merchant accounts at issue in this contention after logging into its computer system information provided on the unexecuted merchant applications submitted by CBG. Colonial's argument that the best evidence rule requires BBP to produce the unexecuted merchant applications used here only as source documents is without merit.[6]

4. Colonial contends that BBP is not entitled to interest because it failed to show entitlement to damages.

A computer-generated summary attached to an affidavit of BBP's vice president of credit review shows that for the merchant accounts at issue in this case, BBP sustained losses in various amounts. Colonial makes no claim that any of the conditions terminating indemnification as to those merchant accounts occurred. Therefore, Colonial is liable to BBP for damages under the terms of the indemnity agreement.

5. Colonial contends that the trial court erroneously granted BBP attorney fees and expenses. It asserts that BBP's claims for such were based on an allegation that it acted in bad faith and that there is no evidence of bad faith.

The record shows, however, that while BBP sought attorney fees and expenses based on an allegation of bad faith, it also based its claims, in the alternative, on the indemnity agreement. The trial court granted attorney fees and expenses based on the indemnity agreement, which entitled BBP to recover attorney fees it incurred in connection with losses resulting from its providing processing services to CBG's merchant accounts. Based on our determination in Division 4 that BBP incurred such losses, it is entitled to recover attorney fees and expenses.[7] No bad faith showing is required.

Colonial also argues that the recovery of attorney fees is barred because BBP failed to comply with the notice provision of OCGA § 13-1-11. That Code section, however, applies only where attorney fees were incurred in the collection of a "note or other evidence of indebtedness"[8] upon maturity and default.[9] We conclude that BBP's

---

[6] See *Morris v. Nat. Western Life Ins. Co.*, 208 Ga. App. 443, 444 (1) (c) (430 SE2d 813) (1993); *Tyner v. Sheriff*, 164 Ga. App. 360-361 (2) (297 SE2d 114) (1982) (summarized statements of what account and records show are admissible, provided records themselves are accessible).

[7] *Thompson v. Enterprise Leasing Co. &c.*, 240 Ga. App. 222, 224 (2) (522 SE2d 670) (1999).

[8] OCGA § 13-1-11 (a) (1), (2), (3); *Boddy Enterprises v. City of Atlanta*, 171 Ga. App. 551, 552 (320 SE2d 374) (1984).

[9] *Boddy Enterprises*, supra at 553.

enforcement of the indemnity agreement is not the type of default situation contemplated by OCGA § 13-1-11.[10] Therefore, that Code section is inapplicable to this case.

6. Colonial contends that the trial court erred in granting summary judgment to ASB, maintaining that to the extent it is liable to BBP, ASB is liable to it under the asset purchase agreement between the two corporations.

"Generally, a purchasing corporation does not assume the liabilities of the seller unless: (1) there is an agreement to assume liabilities; (2) the transaction is, in fact, a merger; (3) the transaction is a fraudulent attempt to avoid liabilities; or (4) the purchaser is a mere continuation of the predecessor corporation."[11] Colonial argues that ASB should be held liable under the theory that it assumed liability in the asset purchase agreement.

The purchase agreement provided:

It is the intention of Colonial to transfer the [electronic banking services division] to ASB along with its liabilities, obligations, and Assets *as shown on the exhibits*. It is the intention of ASB to acquire the [electronic banking services division] and to assume the liabilities and obligations of the [electronic banking services division] as of the Closing Date, except *as otherwise limited herein*.[12]

It further specified the "exhibits": "ASB agrees to assume and discharge all of the liabilities and obligations pursuant to the contracts and agreements *listed on Exhibits 4, 5, 6, and 8* (collectively, the 'Contracts') which are actually assigned to ASB on the Closing Date (collectively, the 'Assumed Contracts')."[13] Finding that BBP's indemnity agreement was not listed on any of such exhibits, the trial court

---

[10] See, e.g., *Holcomb v. Evans*, 176 Ga. App. 654, 657 (3) (337 SE2d 435) (1985) (personal services contract was not "note or other evidence of indebtedness" within meaning of Code section); *O'Brien's Irish Pub v. Gerlew Holdings*, 175 Ga. App. 162, 165-166 (4) (332 SE2d 920) (1985) (exclusive listing contract was not a "note or other evidence of indebtedness" within the meaning of Code section); *Boddy Enterprises*, supra (provision in a deed that a bank sought to enforce for reasonable attorney fees incurred as the result of an eminent domain proceeding in order to protect its security interest in condemned property was not contemplated by Code section). Compare *Groover v. Commercial Bancorp &c.*, 220 Ga. App. 13, 17 (1) (d) (467 SE2d 355) (1996) (personal guaranty on a note was within Code section); *Ga. Color Farms v. K.K.L., Ltd. Partnership*, 234 Ga. App. 849, 852 (3) (507 SE2d 817) (1998) (lease agreement found to be evidence of indebtedness within meaning of Code section); *Kenemer v. First Nat. Bank &c.*, 210 Ga. App. 389-390 (436 SE2d 96) (1993) (Code section applicable where attorney collected debt via a foreclosure proceeding where note and security deed provided for attorney fees).

[11] *Bullington v. Union Tool Corp.*, 254 Ga. 283, 284 (328 SE2d 726) (1985).

[12] (Emphasis supplied.)

[13] (Emphasis supplied.)

granted ASB summary judgment. Colonial contends that the trial court's conclusion was erroneous for several reasons.

(a) First, Colonial contends that ASB assumed liability of these merchant accounts in a section of the purchase agreement that provided,

> ASB agrees to and shall hold Colonial harmless from and shall indemnify Colonial for any loss, cost, liability, lawsuit, claim, damage or expense (including attorneys' fees and court costs) arising out of, related to or stemming from the acquisition of the [electronic banking services division] by ASB and its operations after the Closing Date.

But Colonial has not shown that section to be applicable. The record shows that Colonial's liability is based on its obligation pursuant to the indemnity agreement. Colonial has not shown with citation to the record that its liability is related to ASB's acquisition and operations of the electronic banking services division.[14]

(b) Next, Colonial argues that ASB is liable to it because a section of the purchase agreement provided, "all revenue for the period of time prior to the Closing Date shall belong to Colonial; and there shall be no adjustment for chargebacks or other offsets, which shall be the sole responsibility of ASB." But Colonial has not shown that section to be applicable. Again, the record shows that Colonial's liability is based on its obligation pursuant to the indemnity agreement. Despite its claim in its reply brief, Colonial has not shown with citation to the record that its liability is based on chargebacks or offsets.[15]

(c) Finally, Colonial maintains that although BBP was not expressly listed on an exhibit, BBP was synonymous with Nova Information Systems and Bank of Boulder. It contends that because both of those companies were expressly listed on an exhibit, ASB therefore assumed liability for the indemnity agreement.

Colonial asserts that two years before the asset purchase transaction, the Bank of Boulder sold its credit card division, which it had operated under the name "Boulder Bankcard Processing," to Nova Newco, Inc., which then changed its name to "Boulder Bankcard Processing" ("BBP"). But even assuming this assertion is accurate, there is no showing that BBP was "synonymous" with Bank of Boul-

---

[14] See Court of Appeals Rule 27 (a) (1), (c) (3) (i); *Cox v. Erwin*, 246 Ga. App. 439, 440 (1) (541 SE2d 69) (2000) (it is not the function of this court to cull the record on behalf of a party in search of instances of error; the burden is upon the party alleging error to show it affirmatively in the record).

[15] See Court of Appeals Rule 27 (a) (1), (c) (3) (i); *Cox*, supra.

der when the asset purchase transaction occurred. Thus, the fact that Bank of Boulder was listed on an exhibit is of no consequence.

Colonial claims that Nova Newco was a subsidiary of Nova Information Systems and that after Nova Newco purchased the credit card division from Bank of Boulder, "Nova Information Systems, Inc. . . . and BBP became synonymous and literally operated as one entity." It supports this claim essentially by pointing out that the two companies shared an attorney and that a spreadsheet submitted by BBP showing its losses reflected a column heading, "Date Processing Started with Nova." This information presents no genuine issue as to any material fact.[16] Moreover, the record shows that BBP and Nova Information Systems were separate entities at the time of the asset purchase transaction. They did not merge until three years later. Thus, the fact that Nova Information Systems was listed on an exhibit is of no consequence.

### Case No. A01A2499

7. BBP contends that the trial court erred when it calculated the prejudgment interest at seven percent, pursuant to OCGA § 7-4-2, rather than at eighteen percent, pursuant to OCGA § 7-4-16.

In the absence of a liquidated demand, OCGA § 7-4-16 is inapplicable.[17] The record does not support BBP's claim that the sum it sought was liquidated within the meaning of OCGA § 7-4-15. Damages are liquidated when they are "an amount certain and fixed, either by the act and agreement of the parties, or by operation of law; a sum which cannot be changed by the proof; it is so much or nothing."[18] Here, there was no certain and fixed amount; rather, Colonial agreed to indemnify and hold BBP harmless from "any costs, fines, fees, including attorney's fees . . . arising from or in connection with any losses resulting from and related expenses incurred resulting from BBP performing credit card processing and/or related services for Merchant under the merchant agreement between said Merchant and BBP." Although BBP offered undisputed evidence of the amount of damages, such does not convert unliquidated damages to liquidated damages.[19] OCGA § 7-4-16 is therefore inapplicable.

In actions for unliquidated damages arising out of breach of contract, it is within the discretion of the factfinder to increase the

---

[16] See, e.g., *Carswell v. Nat. Exchange Bank &c.*, 165 Ga. 351, 354 (140 SE 755) (1927) (fact that same person was president of both companies and that other persons were directors in both companies did not alter fact that companies were separate and distinct).

[17] *Typo-Repro Svcs. v. Bishop*, 188 Ga. App. 576, 579 (2) (373 SE2d 758) (1988).

[18] (Punctuation and footnote omitted.) *Carter v. Ravenwood Dev. Co.*, 249 Ga. App. 603, 605 (2) (549 SE2d 402) (2001).

[19] See *Thompson*, supra at 224 (3).

amount of damages by an allowance of interest.[20] Thus, we affirm the trial court's award of interest to BBP at seven percent.

8. BBP contends that although the trial court correctly concluded it was "entitled to recover attorney's fees and expenses pursuant to the Indemnity Agreement," it erred (a) in setting the amount of fees pursuant to the formula set forth in OCGA § 13-1-11 (a) (2), rather than the actual fees and expenses incurred, and (b) in failing to grant it its expenses.

The indemnity agreement indisputably granted BBP reimbursement for expenses and attorney fees related to or resulting from its providing processing services to CBG's merchant accounts. We held in Division 5, supra, that OCGA § 13-1-11 is inapplicable to the indemnity agreement in this case. It follows that the trial court erred in using only the formula set forth in that Code section to compute the attorney fees and expenses awards.[21] We therefore vacate that portion of the judgment and remand the case to the trial court for proper determination of attorney fees and expenses awards.[22]

*Judgment affirmed in Case No. A01A2498. Judgment affirmed in part, vacated in part and case remanded with direction in Case No. A01A2499. Smith, P. J., and Barnes, J., concur.*

DECIDED MARCH 29, 2002.

*Gray & Gilliland, Charles A. Ratz*, for appellant.
*Nations, Toman & Nutter, David C. Nutter, Craig M. Frankel*, for appellees.

---

[20] *Typo-Repro Svcs.*, supra at 579-580; OCGA § 13-6-13.
[21] See *Boddy Enterprises*, supra at 553.
[22] See id.