## A00A1206. WADE et al. v. AMERICAN NATIONAL INSURANCE COMPANY et al.

(540 SE2d 671)

SMITH, Presiding Judge.

In this "dog bite" case, Sherman and Cathy Wade filed an action on behalf of their minor son Matthew Wade after Matthew was bitten by a guard dog at the softball complex where Matthew and Sherman Wade worked. The trial court granted summary judgment to the defendants, American National Insurance Company d/b/a Softball Country Club and Weston Management Corporation. The Wades appeal. Because we conclude that the record does not show the defendants had superior knowledge of a vicious temperament on the part of the dog, we affirm.

Construed in favor of the Wades as nonmovants on motion for summary judgment, the following evidence was presented in the trial court. Sherman Wade was employed as a security officer by Softball Country Club. His 13-year-old son Matthew also worked part-time in the batting cage. On the night of the incident, Sherman accompanied Charlie Rogers, the club's assistant league director, into the club's office area to help Rogers count money received that night. Matthew was also present. This was the "normal routine" followed by Rogers and Sherman and Matthew Wade at the end of the evening. A dog, "Champ," was used by the complex to guard equipment inside a

---

[24] See generally *Head v. Head*, 234 Ga. App. 469, 477-478 (4) (507 SE2d 214) (1998).

fenced area. As he had done on prior occasions, Rogers allowed Champ into the room while Sherman and Matthew were present. Matthew rubbed Champ's back as the dog passed by him, and Champ lay on the floor approximately three or four feet from Matthew. A short time later Matthew began to stand up, and Champ jumped up and bit him on the face. The Wades then filed this action.

In a lengthy and detailed order, the trial court granted summary judgment to the defendants. The court concluded that the Wades' claim could not survive because they failed to show that Champ had bitten anyone before the attack on Matthew or alternatively because they failed to show superior knowledge by the owners that the dog had a vicious propensity. We agree that summary judgment was warranted.

1. In Georgia, a dog owner will be liable for damages only if the owner has knowledge that the "dog has the propensity to do the particular act (biting) which caused injury to the complaining party." (Citations, punctuation and emphasis omitted.) *Hamilton v. Walker*, 235 Ga. App. 635 (510 SE2d 120) (1998). Under this test, the plaintiff must show whether the dog had the propensity to do the act that caused the injury and, "if so, whether the owner had knowledge of that propensity. [Cit.]" Id.

Sherman Wade, himself an employee of the club, testified on deposition that before Matthew's attack, he had never seen Champ growl at anyone or charge the fence where he was kept. When asked whether he had observed Champ exhibiting aggressive tendencies, he stated that the dog would sometimes bark but that "[w]e'd always speak to him, and he'd just go off wagging his tail." When Wade petted Champ on prior occasions, Champ wagged his tail and never growled at Wade or showed his teeth. He stated he would not have had any reservation about being alone with Champ based on his previous contact with the dog and that "the doggone dog was just a big pet." Sherman Wade also testified he had seen Matthew pet Champ and that Champ never reacted aggressively. Champ would simply "[w]ag his tail, lick his hand, just as docile and as calm as he could be." According to Sherman Wade, Champ and Matthew had been together in the same room while money was being counted, and on those occasions, Champ had never growled. He had no reason to believe Champ was a threat.

Matthew Wade similarly testified that he had been in the office with Champ four or five times while his father helped count money and had petted the dog. Champ had never growled or bared his teeth at Matthew but simply wagged his tail. Matthew was not afraid of Champ and had even fed him through the fence. He testified that he had never seen Champ attack any person or any animal.

Rogers testified on deposition that on the night of the attack, he

opened the door to allow Champ to enter the office because he wanted to be sure that Champ saw him before the dog saw anyone else. He stated that "[i]f the dog saw me first, he wouldn't bother anybody." Also, as correctly pointed out by the Wades, he stated that it "was just a natural" to make sure that no one went into Champ's enclosure alone or that the dog was not "turned out" when other people were around. But Rogers also testified that as long as Champ was with him, the dog "was fine." We note that when asked whether Champ had displayed "aggressive behavior such as growling, chasing, any sort of threatening actions toward any other people," Rogers acknowledged that the dog "would do that anytime a stranger walked up to the fence." But Rogers also recounted an incident when a man had walked into Champ's enclosure. While the man's presence in the fenced enclosure incident "scared [Rogers] to death," Champ did not attack or even bother the man. Rogers further testified that he had known Champ to escape his fenced enclosure and that to his knowledge, Champ had never attacked anyone before the incident at issue here.

The evidence presented in the trial court shows that the defendants did not have knowledge of any propensity of Champ to bite. The testimony of Sherman Wade, an employee of the defendants for approximately three years before the incident, showed he had never known the dog to act aggressively. And we cannot conclude that Rogers's testimony created issues of fact as to the defendants' knowledge concerning the dog's propensity to act viciously. He indeed testified that he took precautions such as allowing Champ to see him first so Champ would not "bother" anyone, and he stated that it was "natural" for him not to allow other people to be alone with the dog.

But the record *also* shows Rogers's knowledge that Champ exhibited aggressive behavior only to strangers when they walked up to his enclosure. Even then, under Georgia law, a dog's aggressive or menacing behavior alone is not sufficient to place its owner on notice of a propensity to bite. *Hamilton,* supra at 636. Even though evidence was presented that Champ barked and growled at strangers at the fence, the record is devoid of evidence of previous attacks on people or animals. Furthermore, Rogers believed Champ would not harm anyone while Rogers was nearby. The record is clear that Matthew was not a stranger to Champ, nor was he alone with Champ inside Champ's enclosure. Instead, Rogers was present in the same small office with Champ, Sherman Wade, and Matthew. Summary judgment in the defendants' favor was therefore warranted.

The defendants were entitled to summary judgment for another reason. A central theory of liability advanced by the Wades is that because Champ was a guard dog, the defendants should have known that he had a vicious propensity. But both Sherman and Matthew

Wade also knew Champ was a guard dog. Sherman Wade acknowledged that he had made the "basic assumption" that Champ was a guard dog with the intended task of guarding equipment in the compound where he was housed. Matthew also assumed that Champ was a guard dog and might bite someone who came into the area he was to protect. Whether their cause of action is based on the premises liability statute (OCGA § 51-3-1) or the dangerous animal liability statute (OCGA § 51-2-7), they are "still required to produce evidence of the vicious propensity of the dog in order to show the dangerous condition *of which the premises owner had superior knowledge. [Cit.]*" (Emphasis supplied.) *Webb v. Danforth*, 234 Ga. App. 211, 212 (505 SE2d 860) (1998). In other words, "the true test of liability" is the owner's "superior knowledge of his dog's temperament. [Cits.]" *Supan v. Griffin*, 238 Ga. App. 404, 406 (519 SE2d 22) (1999). Under the facts of this case, the evidence does not demonstrate that the defendants had knowledge of Champ's temperament superior to that of the Wades.

The cases relied on by the Wades are distinguished on their facts from those here. In *Supan*, supra at 404, we concluded that issues of fact existed as to whether the defendant dog owner had superior knowledge of his dog's vicious propensity. He owned several dogs, and less than a month before the attack on plaintiffs' son, he had told another neighbor "'to do whatever was necessary to keep the dogs from attacking.'" Id. at 404-405. Those dogs had previously "'viciously attacked'" the neighbor's dog and had threatened the neighbor with "'bared fangs, vicious growls and attack behavior.'" Id. at 405. Similarly, in *Thurmond v. Saffo*, 238 Ga. App. 687 (520 SE2d 43) (1999) (physical precedent only), we concluded that factual issues existed as to the defendants' knowledge of their dog's vicious propensity, since the evidence showed they knew the dog "had tried to attack another person and had scolded him for this behavior." Id. at 688. Here, however, the record does not show that the defendants had any knowledge that Champ had ever attempted to attack another animal or human. In fact, the record shows that although Champ was kept to guard equipment in the fenced area where he was housed, he did not attack a stranger who entered the area.

Likewise, *McBride v. Wasik*, 179 Ga. App. 244 (345 SE2d 921) (1986) is not controlling. In *McBride*, although the dog had never bitten anyone, evidence was presented that he had been seen charging and leaping "upon small children while snarling and growling, knocking the children to the ground on numerous occasions." Id. Testimony was also presented that the defendant had commanded the dog to kill a neighbor and that the dog responded by running toward her, stopping only after the defendant commanded the dog to do so. Id. No such evidence of violent behavior was presented here.

2. The Wades contend the trial court erred in refusing to consider a receipt and check concerning Champ's purchase. The receipt does contain the term "on-site aggitation [sic]" and indicates that the price paid for Champ included the dog and "its training." The Wades argue that this language creates an issue of fact as to the defendants' knowledge of Champ's temperament. But assuming, without deciding, the trial court should have considered the check, no evidence in the record even suggests the meaning of the term "on-site aggitation." Any assumption by the Wades that this term shows Champ's propensity to bite amounts to simple speculation and cannot defeat the appellees' showing that no genuine issues of material fact exist as to their knowledge of Champ's temperament. "Guesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment. [Cits.]" *Brown v. Amerson*, 220 Ga. App. 318, 320 (469 SE2d 723) (1996).

3. Arguing that no precedent exists in this state concerning "attacks on third parties by dogs specifically purchased and used for guarding commercial property," the Wades contend the standard of liability for attacks by such dogs "should not be the same standard used for household pets as applied by the trial court." They propose the following standard:

[S]ince such animals are employed as security dogs to protect commercial property, this fact by itself . . . establishes a rebuttable presumption that such animals have a known propensity to attack which, standing alone, creates a jury question concerning the defendants' liability to third parties attacked by said dogs.

We first note that some authority does exist for applying the "first bite" rule to a watchdog. As stated in *Smith v. Culver*, 172 Ga. App. 183 (322 SE2d 294) (1984), "[t]his court has adhered to the scienter requirement even where a dog apparently served as a nighttime watchdog on the owner's commercial premises. [Cit.]" See also *McCree v. Burks*, 129 Ga. App. 678 (200 SE2d 491) (1973). But even in the absence of this authority, the Wades' argument seems to be premised, at least in part, on the assumption that guard dogs are inherently vicious. Our legislature, however, has enacted a statute addressing the liability of owners of vicious animals for injuries caused by those animals. OCGA § 51-2-7. Creation of a special "subclass" of animals specifically designated as inherently dangerous must be addressed to the legislature, not this court. Moreover, even if we adopted the standard proposed by the Wades, summary judgment would have been appropriate here, as the evidence presented in the

trial court rebutted any presumption that the defendants had superior knowledge of Champ's propensity to bite, if any.

*Judgment affirmed. Johnson, C. J., and Phipps, J., concur.*

DECIDED OCTOBER 23, 2000.

*Cross & Rosenzveig, John P. Cross II, Bette E. Rosenzveig,* for appellants.

*Finley & Buckley, Jerald R. Hanks, Hull, Towill, Norman, Barrett & Salley, James S. Weston,* for appellees.