**THIRD DIVISION
ELLINGTON, P. J.,
DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**February 24, 2016**

# In the Court of Appeals of Georgia

A15A2378. SWANSON et al. v. TACKLING et al.

DILLARD, Judge.

In this interlocutory appeal, Julia and Dave Swanson appeal the trial court's denial of their motion for summary judgment in Jessica Tackling's personal-injury action seeking to hold them liable for serious injuries that her minor son sustained when he was bitten by their dog. On appeal, the Swansons argue that they are entitled to summary judgment because the record is devoid of any evidence that their dog had a propensity to bite or act aggressively towards a person. We agree that the trial court erred in denying their motion for summary judgment, and for the reasons set forth *infra*, reverse.

Viewed in the light most favorable to Tackling (*i.e.*, the nonmoving party),[1] the evidence shows that on April 26, 2012, she traveled with her seven-year-old son, J. R., and her then-boyfriend, Matthew Day, to spend a weekend with the Swansons, who are Day's mother and stepfather. Upon their arrival, Julia greeted them and then introduced them to the Swansons' great danes, Gussy and Willow, who were "gated off" in another room at the time. While Gussy sniffed J. R. and "seemed to be fine," Willow put her head over the gate "pretty close" to J. R. and "barked directly in his face." Willow's conduct made Tackling uncomfortable, and when they went to their bedroom for the evening, she told Day that she "did not want Willow loose around [J. R.] at any given time." However, Tackling did not share this information with either of the Swansons.

The next morning, Julia and J. R. awoke early and went to the store to buy doughnuts for breakfast. While at the store, Julia purchased stuffed bunnies for the dogs because Willow "loved stuffed animals" and the bunnies were on sale for Easter. After breakfast, J. R. asked Julia if he could give Willow one of the bunnies, and Julia let Willow, who was outside, into the sunroom where J. R. was holding the bunny

---

[1] *See, e.g., Garden City v. Herrera*, 329 Ga. App. 756, 757 (766 SE2d 150) (2014).

under his arm. As soon as Willow came into the sunroom, she approached J. R. and, in an attempt to retrieve the bunny, bit his arm. When J. R. began to scream and cry, he bent his head down and Willow also bit him on the head. Day, who was nearby, immediately restrained Willow and took her outside. This entire incident happened in a matter of seconds. Tackling, who heard J. R. screaming from another room, ran to the sunroom and took him to another room. At this point, J. R. began going into shock, and Tackling removed his sweatshirt to look for wounds. She first noticed a wound on his arm, but when J. R. indicated that he felt dizzy, Tackling then saw a gash in his head that went "down the side of his face." After discovering these wounds, Tackling, Day, and Julia rushed J. R. to the hospital, where he was treated for his injuries.

Approximately two years later, on March 24, 2014, Tackling, in her individual capacity and in her capacity as J. R.'s mother, next friend, custodial parent, and natural guardian, filed a personal-injury complaint against the Swansons, asserting that J. R.'s "serious and permanently disfiguring injuries" resulted from their "failure to maintain proper control over [Willow] as required by law," and that this failure occurred despite their knowledge of the dog's vicious propensities. Discovery ensued, and on November 13, 2014, the Swansons moved for summary judgment, arguing that

3

they could not be held liable for J. R.'s injuries because it was undisputed that, prior to the incident with J. R., Willow had never displayed any vicious tendencies. The trial court denied their motion, summarily concluding that there were genuine issues of material fact to be decided by a jury. Thereafter, the trial court granted the Swansons a certificate for immediate review, and this Court granted their application for an interlocutory appeal. This appeal follows.

At the outset, we note that summary judgment is appropriate when "the moving party can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."[2] And a defendant meets this burden when the court is shown that "the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case."[3] Finally, if the moving party satisfies this burden, the nonmoving party cannot rest on its pleadings, but "must point to specific evidence giving rise to a triable issue."[4] With these guiding principles in mind, we turn now to the Swansons' specific enumeration of error.

---

[2] *Garden City*, 329 Ga. App. at 758 (punctuation omitted).

[3] *Id.* (punctuation omitted).

[4] *Id.* (punctuation omitted).

4

In their sole claim of error, the Swansons argue that they are entitled to summary judgment because there is no evidence that Willow ever displayed vicious behavior or evinced a propensity to bite anyone prior to biting J. R. We agree.

Although Tackling's complaint does not specify which statute her personal-injury action is based upon, we note that, in a dog-bite case, a plaintiff can recover based on a dangerous-animal-liability theory under OCGA § 51-2-7[5] or a premises-liability theory under OCGA § 51-3-1.[6] But as we have previously explained,

_____

[5] *See* OCGA § 51-2-7 ("A person who owns or keeps a vicious or dangerous animal of any kind and who, by careless management or by allowing the animal to go at liberty, causes injury to another person who does not provoke the injury by his own act may be liable in damages to the person so injured. In proving vicious propensity, it shall be sufficient to show that the animal was required to be at heel or on a leash by an ordinance of a city, county, or consolidated government, and the said animal was at the time of the occurrence not at heel or on a leash."). We note that there is no evidence, and Tackling has not alleged, that the Swansons were subject to any ordinance requiring Willow to be at heel or on a leash when she bit J. R.

[6] *See* OCGA § 51-3-1 ("Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe."); *see also Custer v. Coward*, 293 Ga. App. 316, 319 (2) (667 SE2d 135) (2008) (acknowledging, in a dog-bite case, that the plaintiff's cause of action could be based either on the premises-liability statute or the dangerous-animal-liability statute); *Wade v. Am. Nat'l. Ins. Co.*, 246 Ga. App. 458, 461 (1) (540 SE2d 671) (2000) (same). Notably, although Tackling's complaint did not indicate which theory of liability she was suing under, she references both OCGA § 51-3-1 and OCGA § 51-2-7 in her appellate brief.

[i]n a typical dog bite case, regardless of whether the cause of action is based on the premises[-]liability statute (OCGA § 51-3-1) or the dangerous[-]animal[-]liability statute (OCGA § 51-2-7), a plaintiff must produce evidence of the vicious propensity of the dog in order to show that the owner of the premises had superior knowledge of the danger.[7]

Further, to infer the requisite knowledge there "must be *at least one incident* that would cause a prudent person to anticipate the actual incident that caused the injury."[8] And although a dog owner "need not be aware of the dog's propensity to do the exact same act that caused the injury at issue,"[9] the prior incident must be the same type as the incident at issue.[10] Lastly, it is well settled that "a dog's menacing behavior alone

---

[7] *Abundant Animal Care, LLC v. Gray*, 316 Ga. App. 193, 195 (1) (728 SE2d 822) (2012) (punctuation omitted); *accord Custer*, 293 Ga. App. at 319 (2).

[8] *Stennette v. Miller*, 316 Ga. App. 425, 428 (1) (b) (729 SE2d 559) (2012) (emphasis supplied) (punctuation omitted); *accord Kringle v. Elliott*, 301 Ga. App. 1, 2 (686 SE2d 665) (2009); *Durham v. Mooney*, 234 Ga. App. 772, 773 (1) (507 SE2d 877) (1998).

[9] *Durham*, 234 Ga. App. at 773 (1); *accord Torrance v. Brennan*, 209 Ga. App. 65, 67 (2) (432 SE2d 658) (1993).

[10] *See Kringle*, 301 Ga. App. at 2 ("[I]n order to infer the requisite knowledge[,] there must be at least one incident that would cause a prudent person to anticipate the *actual incident* that caused the injury." (punctuation omitted) (emphasis supplied)); *Durham*, 234 Ga. App. at 773(1) (same); *Rowlette v. Paul*, 219 Ga. App. 597, 599 (466 SE2d 37) (1995) (noting that "[i]t is not enough, however, that the possessor of the animal has reason to know that it has a propensity to do harm in one or more specific ways; it is necessary that he have reason to know of its propensity to do harm

does not demonstrate its vicious propensity or place its owner on notice of such propensity."[11]

In the case *sub judice*, there is no evidence whatsoever of a prior incident in which Willow exhibited behavior even remotely similar to biting, attacking, or otherwise injuring a person. In fact, the Swansons' undisputed testimony was that, prior to biting J. R., Willow had never bitten, chased, jumped on, nipped at, or even growled at anyone. Additionally, Dave, who was primarily responsible for the dogs, testified that, before this incident, he would have allowed Willow to be around small children, and that he "never would have expected Willow to bite [a] kid." Similarly, Day testified that he was unaware of any incident, prior to the one with J. R., in which Willow acted in a threatening, vicious, or harassing nature toward anyone. And while Tackling repeatedly asserts on appeal that the Swansons were aware of Willow's propensity to bite someone, she does not identify any prior incident when Willow exhibited aggressive or vicious behavior. To be sure, Willow barked in J. R.'s face

_____

of the type which it inflicts" (punctuation omitted)); *Sutton v. Sutton*, 145 Ga. App. 22, 25 (1) (243 SE2d 310) (1978) (noting that the proper test is "whether the one incident was of such a nature as to cause a reasonably prudent person to believe that the animal was sufficiently dangerous as to be likely to cause an injury at a later time").

[11] *Stennette*, 316 Ga. App. 429 (1) (b); *accord Wade*, 246 Ga. App. at 460 (1).

7

when he arrived at the Swansons' home, but such behavior is insufficient to put the Swansons on notice that the dog would later attack and bite him.[12]

Tackling, nevertheless, argues that the Swansons were on notice of Willow's propensity to attack a child merely because she was protective of her toys and would "go after" them. But as previously noted, the law required Tackling to offer evidence of a prior incident that is of the same type as incident at issue.[13] This, she has not done. Moreover, the undisputed evidence was that Willow went after or fetched her toys in a playful manner only *if* someone threw them. Suffice it to say, playing fetch bears no similarity to the act of biting someone.[14]

---

[12] *See Phiel v. Boston*, 262 Ga. App. 814, 816-17 (1) (586 SE2d 718) (2003) (holding that a dog's behavior of barking and growling amounted only to menacing behavior insufficient to notify the owner of the dog's propensity to bite); *Durham*, 234 Ga. App. at 773 (1) (holding that barking and growling, at most, amounted to menacing behavior, which does not establish a vicious propensity).

[13] *See Kringle*, 301 Ga. App. at 2; *Durham*, 234 Ga. App. at 773 (1); *Rowlette*, 219 Ga. App. at 599; *Sutton*, 145 Ga. App. at 25 (1).

[14] *See supra* footnote 10 & accompanying text.

Tackling further argues that, under our recent decision in *Green v. Wilson*,[15] the Swansons are not "as a matter of law, absolved from responsibility for their negligence and the resulting injury to [J. R.] simply because they had never in the past loosed the dog and allowed the [g]reat [d]ane to attack a child holding its toy resulting in the child being bitten." But *Green* is readily distinguishable from the instant case because, although the dog in *Green* had not previously engaged in the *exact same* behavior that caused the plaintiff's injury (*i.e.*, jumping over a fence and chasing the plaintiff), there was evidence that "on at least one occasion," the dog had lunged at the dog owners' housekeepers while one of its owners held the dog back.[16] Under these particular circumstances, we held in *Green* that "evidence of the incident in which [the dog], while restrained, lunged aggressively at a house cleaner raises a genuine issue of material fact as to whether a prudent person would anticipate that [the dog] would chase someone if unrestrained."[17] But here, as previously discussed,

[15] 333 Ga. App. 631 (773 SE2d 872) (2015) (physical precedent only), *cert. granted* (No. S15G1888) (Jan. 11, 2016). The Supreme Court of Georgia granted certiorari in *Green* to consider whether the Court of Appeals erred "when it reversed the award of summary judgment to the appellant[.]"

[16] *See Green* 333 Ga. App. at 633.

[17] *See id.*

9

Tackling has not identified *any* specific prior "incident"that could have possibly placed the Swansons on notice of Willow's propensity to bite or attack anyone.

Lastly, Tackling argues that, even in the absence of a "leash law" or the Swansons' prior knowledge of their dog's propensity to injure, they are not entitled to summary judgment because Georgia courts have allowed "an injured victim to recover [when] a person voluntarily undertakes to restrain a dog and fails to do so, causing injury." And while it is certainly true that "a person may be held liable for the negligent performance of a voluntary undertaking,"[18] there is no evidence of any such undertaking in this case. Indeed, each of the "voluntary undertaking" cases that Tackling relies upon involve an affirmative promise by the dog owner to restrain the dog while the injured person was at his or her home to perform a job.[19] But here,

---

[18] *Stennette*, 316 Ga. App. at 430 (3) (punctuation omitted); *accord Osowski v. Smith*, 262 Ga. App. 538, 540 (1) (586 SE2d 71) (2003).

[19] *See Stennette*, 316 Ga. App. at 430-31 (3) (holding that the evidence created a genuine issue of material fact as to whether the dog owner had undertaken a duty to keep the dogs away from a housekeeper when the housekeeper had asked the dog owner to confine the dog while she cleaned the house and the dog owner complied with her request on previous occasions); *Osowski*, 262 Ga. App. at 538, 540-41 (1) (holding that there was a jury question regarding whether the dog owner had voluntarily undertaken to restrain his dogs when there was evidence that the injured party, a technician who was at the dog owner's home to install cable television, expressed concern about the dogs and the dog owner promised to "retain" the dogs if the technician wanted him to do so and stated that he "would take care of it"); *see*

although Tackling advised Day that she did not want Willow to be on the loose around J. R., there is no evidence that she asked either of the Swansons to restrain Willow or that they promised to do so.[20]

In sum, Tackling has identified no evidence that Willow had ever bitten or attempted to bite anyone before, that she had a tendency to attack humans, or that the Swansons otherwise had knowledge about her temperament that would have placed them on notice that she would bite someone. Thus, while we have the greatest sympathy for the injuries suffered by J. R., the trial court nevertheless erred in denying the Swansons' motion for summary judgment.[21]

---

*also Abundant Animal Care, LLC*, 316 Ga. App. at 196 (2) ("One of the essential elements of [a voluntary-undertaking] claim is reasonable reliance by the injured person upon the voluntary undertaking.").

[20] In her brief, Tackling summarily asserts that there was "some evidence the defendants affirmatively agreed to restrain the dog," but she provides no record citations to support this conclusory assertion.

[21] *See Stennette*, 316 Ga. App. at 428-29 (1) (b) (holding that the owner of a dog who bit the plaintiff was entitled to summary judgment when, although the dog had previously jumped on the plaintiff in an "aggressive manner," the dog did not attempt to bite or scratch, and the plaintiff conceded that she was unaware of any prior instance when the dog had bitten a person); *Abundant Animal Care, LLC*, 316 Ga. App. at 195-96 (1) (holding that an animal clinic was entitled to summary judgment in a personal-injury action in which the plaintiff was bitten by one of its dogs when it was undisputed that the dog had never bitten or harmed anyone before the relevant incident); *Huff v. Dyer*, 297 Ga. App. 761, 763 (1) (678 SE2d 206)

11

For all of the foregoing reasons, we reverse the trial court's denial of summary judgment to the Swansons.

*Judgment reversed. Ellington, P. J., and McFadden, J., concur.*

---

(2009) (noting that evidence that a dog barked at a child amounted only to menacing behavior and did not serve as evidence of the dog's vicious propensity); *Custer*, 293 Ga. App. at 319 (1)-(2) (holding that dog owners were entitled to summary judgment either under the premises-liability or dangerous-animal-liability theories when the dog that bit the plaintiff had never previously attacked or bitten a human and the owners had no superior knowledge of the dog's propensity to bite); *Wade*, 246 Ga. App. at 460 (1) (holding that the defendant dog owner was entitled to summary judgment in a dog-bite case because, even though there was evidence that the dog "barked and growled at strangers at the fence, the record [was] devoid of evidence of previous attacks on people or animals").