**FIRST DIVISION**
**BARNES, P. J.,**
**DILLARD, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**March 5, 2021**

# In the Court of Appeals of Georgia

A20A1721. COPELAND v. HOME GROWN MUSIC, INC.

DILLARD, Presiding Judge.

Braden Copeland was an early supporter and financial backer of his friend Zachry Brown's eponymously named "Zac Brown Band."[1] Indeed, he provided the band with several crucial loans in 2006 without any written agreement. But in short order, Copeland and the band's corporate identity, Home Grown Music, Inc.,[2] entered into an agreement memorializing the terms of their financial relationship. This agreement provided that—in exchange for his investments—Copeland would share

---

[1] The Zac Brown Band is an award-winning "American country/rock band based in Atlanta, Georgia." https://en.wikipedia.org/wiki/Zac_Brown_Band (last visited on February 17, 2021).

[2] For ease of reference, we will refer to Home Grown Music, Inc. as "HGM" throughout the opinion.

in the band's potential future success via a percentage of the royalties from music and merchandise sales. And Copeland's faith in the Zac Brown Band was richly rewarded just a few years later when the group signed with a major record label and immediately rocketed up the country music charts with the song "Chicken Fried." Unfortunately, Copeland's relationship with the band eventually soured when he began to believe HGM was failing to pay him royalties that he was entitled to under their agreement. So, he sued HGM for breach of contract and lost. The trial court disagreed with Copeland's interpretation of the agreement, and granted summary judgment in HGM's favor. Copeland appeals, arguing that genuine issues of material fact remain as to whether he is entitled to royalties on the sales of individual recordings under the agreement. He also claims entitlement to attorney fees and prejudgment interest for HGM's failure to pay him royalties on the sales of merchandise that it acknowledged were due to him under the agreement. Finally, Copeland maintains that the trial court erred in awarding HGM litigation costs. For the reasons set forth *infra*, we affirm the trial court's grant of summary judgment to HGM, but partially reverse its award of costs.

Viewed in the light most favorable to Copeland (*i.e.*, the nonmoving party),[3] the record shows that he and Brown became friends in late 2005, after meeting while Copeland was conducting due diligence for a commercial real estate transaction. As a friend and fan of the Zac Brown Band, Copeland began helping Brown fund his group in February 2006 by providing a series of loans. And by July 2007, despite having no written agreement for repayment at that time, Copeland had provided over $73,000 to assist the Zac Brown Band with expenses such as touring, hiring studio musicians and mixers, booking studio time, and recording the group's first major-label studio album—*The Foundation*.

As early as the previous summer, Copeland and Brown discussed converting the loans into an investment toward the band's potential future success. Specifically, rather than simply repaying the loans, Brown would grant Copeland a share in the royalties generated by sales of the band's music and merchandise. And toward that end, on August 22, 2006, Copeland drafted a letter to Brown and HGM, outlining the details of their proposed agreement. This letter agreement was revised several times over the course of a year, with assistance from HGM's attorney, and the final

---

[3] *See, e.g., Swanson v. Tackling*, 335 Ga. App. 810, 810 (783 SE2d 167) (2016).

3

agreement was signed by Copeland and Brown, as president of HGM, on September 7, 2007.

The agreement was divided into two sections, with each section contemplating a rather distinct means by which the album would be distributed and sold. Specifically, the first section outlined the method by which revenue would be shared prior to the band entering into any contract with a record company. In relevant part, that section of the agreement provided:

> To repay the Investments and in consideration of making the Investments, you and I agree that:
>
> A. until you elect in your sole discretion, to enter into an exclusive recording agreement with a Record Company (as defined below), the Investments shall be repaid as follows:
>
> i. in respect of net sales by you of records embodying the entire Album independently, i.e., sales by you directly to the consumer (such as at live shows or from your Internet website) or through a so-called "distribution" or "P&D" arrangement between Home Grown Music and a distributor (such as Caroline, RED, ADA, Fontana, Redeye, Navarre or the like) ("Independent Sales"), I will receive, payable monthly:g
>
> 1. Fifty percent (50%) of the Net Receipts from such sales, up to a maximum of $5.00 per physical Record sold and up to $3.50 per

digitally downloaded Record sold, payable monthly, until the total Investments are repaid in full.

 . . .

ii after the Investments are repaid in full, in respect of net sales by you of records embodying the entire Album, or individual recordings from the Album, i.e., individual downloads of recordings from the Album, by Independent Sales, I will receive, on a prospective basis, payable monthly: (1) $.20 (twenty cents) per record sold, whether in the form of physical record or digitally downloaded record, embodying the entire Album; and (2) $.015 (one-and-one-half cents) per download sold of an individual recording from the album.

The second section contemplated the band entering into a contract with a record company and, in relevant part, provided:

B. in the event that you elect to enter into a recording agreement with a Record Company:

i. the outstanding balance, if any, of the Investments shall, unless otherwise agreed by you and me in writing, be repaid to me as follows:

1. one hundred percent (100%) of the outstanding balance of the Recording Investment will, unless otherwise agreed by me, be reimbursed from the "recording fund" or "recording budget" payable by the Record Company;

. . .

ii. in respect of net sales by you of records embodying the entire Album via a third party record label (i.e., other than you) (a "Record Company"), you will pay me, or cause me to be paid, a royalty (the "Override Royalty") on net sales of full-priced top line records embodying the Album by the Record Label through normal retail channels in the United States in the amount of two percent (2.0%) of SRLP (or an equivalent royalty in "pennies" where your royalty is calculated as a percentage of wholesale price or published price to dealers). The Override Royalty on other sales (including foreign sales) will be reduced (but not escalated), adjusted and paid in the same proportion, and at the same times, as is your basic "all in" royalty. The Override Royalty will not be payable until all recoupable recording costs (as such term is defined in the agreement with the Record Company) incurred in connection with the Album have been recouped by you at the net artist rate (i.e., your basic "all in" royalty less the royalties payable to producers, mixers and me) and thereafter the Override Royalty will be payable on a prospective basis only. . . .

Thereafter, both parties performed according to the first section of the agreement. But on October 23, 2008, HGM entered into an exclusive recording agreement with Atlantic Recording Corporation. Additionally, by this time, the band's first album—*The Foundation*—was well on its way to becoming an enormous

6

artistic and financial success. Indeed, under the September 2007 agreement with HGM, Copeland has received over $800,000 in royalty payments.

Nevertheless, in the summer of 2009, Copeland noticed that he did not appear to be receiving royalty payments for downloads or sales of individual recordings, and so he contacted HGM's accountant to inquire about such payments. The accountant—who had his own firm and was not an HGM employee—indicated to Copeland that inquires were being made to Atlantic, but did not otherwise answer Copeland's question. Then, on February 1, 2010, Copeland received an accounting statement and payment from Atlantic that did not include payment for individual recordings. This prompted Copeland to contact Brown, who responded that he should, again, contact HGM's accountant. He did so, but received no response. Copeland followed up on February 28, 2010, and this time the accountant responded that he was working on the situation. But after hearing nothing for over a month, Copeland again followed up with the accountant on April 19, 2010, but this inquiry also went unanswered. Unbeknownst to Copeland, several months earlier an Atlantic representative emailed HGM's attorney to ask whether Copeland was supposed to be paid for single-track downloads, and the attorney responded: "Album only. Thanks."

Over the next four years, Copeland continued receiving royalty payments, but in March 2014, he discovered that he had not received the two most recent quarterly payments for merchandise sales. So, on March 22, 2014, Copeland emailed HGM's accountant, who responded that he was no longer working with HGM because the company had moved its accounting in-house. And although the now-former accountant copied his response and Copeland's original email to the in-house accountant at HGM, Copeland initially received no response. Consequently, in April 2014, Copeland hired legal counsel; and one month later, his counsel sent HGM a demand letter for payment of the merchandise royalties, as well as a draft complaint. This time HGM did respond. Acknowledging that the merchandise royalties owed for the three most recent quarters had been overlooked due to a transition to in-house accounting, HGM provided Copeland's counsel with sales statements for the relevant quarters and offered to pay the amounts due to him under those statements. Additionally, HGM offered Copeland access to its sales records and proposed that once an agreement was reached as to the exact amount owed, Copeland would sign a release and receive the payment; but Copeland's counsel balked at signing a release.

8

On June 23, 2014, Copeland filed a complaint against HGM for breach of contract, seeking unpaid royalties for sales on individual recordings/songs and merchandise, attorney fees, and prejudgment interest. HGM filed an answer, and thereafter deposited over $150,000 in the registry of the court in a good-faith effort to resolve the merchandise-royalties issue. Discovery then ensued, and when it concluded, HGM filed a motion for summary judgment. Copeland filed a response, and on August 1, 2017, the trial court held a hearing on the matter, during which the parties agreed to resolve the merchandise issue. Indeed, two months after the hearing (and prior to the trial court ruling on HGM's motion), the parties signed a consent order, in which they agreed to resolve the merchandise-royalties issue by payment of the registry funds to Copeland, but stipulated that his claim for attorney fees and interest pertaining to those royalties remained pending.

On August 22, 2018, the trial court granted HGM's motion for summary judgment as to all of Copeland's remaining claims. Specifically, the court ruled that under the September 2007 agreement, HGM did not owe Copeland royalties on the sales of individual recordings after the band signed with Atlantic and that neither attorney fees under OCGA § 13-6-11 nor interest under OCGA § 13-6-13 was warranted based on HGM's failure to pay the merchandise royalties addressed by the

9

consent order. A few months later, the trial court entered a final judgment and awarded HGM costs. This appeal follows.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4] If summary judgment is granted, it enjoys no presumption of correctness on appeal, and an appellate court must satisfy itself that the requirements of OCGA § 9-11-56 (c) have been met.[5] And in conducting this *de novo* review, we are charged with "viewing the evidence, and all reasonable conclusions and inferences drawn from the evidence in the light most favorable to the nonmovant."[6] Bearing these guiding principles in mind, we turn to Copeland's specific claims of error.

---

[4] OCGA § 9-11-56 (c).

[5] *See Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) ("Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met.").

[6] *Benefield v. Tominich*, 308 Ga. App. 605, 607 (1) (708 SE2d 563) (2011) (punctuation omitted); *accord Swanson*, 335 Ga. App. at 810.

1. Copeland first contends that the trial court erred in granting summary judgment, arguing that genuine issues of material fact remain as to whether HGM owes him royalties on the sales of individual recordings under the terms of the September 2007 agreement. We disagree.

It is well established that the construction of a contract is "a question of law for the court,"[7] involving the following three analytical steps:

> The first step is to decide whether the language of the contract is clear and unambiguous. If so, the contract is enforced according to its plain terms, and the contract alone is looked to for meaning. Second, if the language of the contract is ambiguous in some respect, the rules of contract construction must be applied by the court to resolve the ambiguity. And finally, if ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.[8]

---

[7] *Shields v. RDM, LLC*, 355 Ga. App. 409, 413 (1) (844 SE2d 297) (2020) (punctuation omitted).

[8] *Id.* (punctuation omitted); *accord Bd. of Cmm'rs of Crisp Cty. v. City Cmm'rs of the City of Cordele*, 315 Ga. App. 696, 699 (727 SE2d 524) (2012).

11

Importantly, the cardinal rule of contract construction is "to ascertain the intention of the parties, as set out in the language of the contract."[9]

In this matter, we need not go beyond the first step. It is undisputed that HGM entered into a recording contract with Atlantic in October 2008. So, from that point forward, the method by which royalties would be shared between Copeland and HGM was governed by subsection B of the September 2007 agreement and, specifically, paragraph ii. And while paragraph ii of subsection B explicitly provides the percentage Copeland was to be paid on sales of "records embodying the entire Album," there is—in stark contrast to paragraph ii of subsection A, which includes the term "individual recordings from the Album"—no mention of individual recordings, much less any method for calculating royalties for such sales. This omission is notable. It also triggers a well-known principle of construction—applicable to statutes and contracts alike—"expressio unius est exclusio alterius" or "[t]he express mention of one thing implies the exclusion of

---

[9] *Shields*, 355 Ga. App. at 413 (1) (punctuation omitted); *accord Stanley v. Gov't Emps. Ins. Co.*, 344 Ga. App. 342, 344 (1) (810 SE2d 179) (2018).

another[,]"[10] which, in turn, requires us to conclude that such omission was intentional.[11]

Nevertheless, Copeland argues that the September 2007 agreement is ambiguous as to whether he is to be paid royalties on the sales of individual recordings. And in doing so, he cites to the second sentence in subsection B ii, which

[10] *Miller Cty. Bd. of Educ. v. McIntosh*, 326 Ga. App. 408, 413 (1) (756 SE2d 641) (2014) (punctuation omitted); *see also Bailey v. Lumpkin*, 1 Ga. 392, 404 (1846 WL 1192, *12-13) (1846) ("The maxim 'expressio unius est, exclusio alterius,' the express mention of one thing implies the exclusion of another, is frequently quoted in our courts . . . This maxim applies, in the first place, rather in the construction of contracts than statutes. . . .").

[11] *See HHE Innovation, LLC v. Shinhan Bank of Am.*, 343 Ga. App. 881, 886-87 (1) (808 SE2d 258) (2017) (holding that under the canon "expressio unius est, exclusio alterius," contract stating that "the first mortgage on subject property remains intact," the contract necessarily implies that the second mortgage on the same property would not remain intact, that is, would be released); *McIntosh*, 326 Ga. App. 413-14 (1) (applying the canon "expressio unius est, exclusio alterius" to conclude that in construing an employment contract a comparison of the express requirements of the written statement of charges by the board versus the employee's obligation to merely set forth his "contentions" in response thereto indicates that the parties did not intend to place an equivalent explanatory burden on employee as to the contents of his reply); *George L. Smith II Ga. World Congress Ctr. Auth. v. Soft Comdex, Inc.*, 250 Ga. App. 461, 464 (1) (b) (550 SE2d 704) (2001) (holding that under the maxim "expressio unius est exclusio alterius," the list of "Facilities Licensed" in the contract is presumed to exclude any facility not specifically listed); *see also Hudson v. Housing Auth. of Baltimore City*, 935 A2d 395, 402 (Md. Ct. Spec. App. 2007) (noting that "[t]he principles of applying a plain meaning approach include consideration of the doctrine of 'expressio unius est exclusio alterius'") (citation omitted).

provides: "The Override Royalty on other sales (including foreign sales) will be reduced (but not escalated), adjusted and paid in the same proportion, and at the same times, as is your basic 'all in' royalty." Specifically, Copeland claims that the term "other sales" could be construed to include sales of individual recordings. This contention is a nonstarter. Indeed, such a] construction ignores the context of the preceding sentence,[12] which—in characterizing the payment to him as an "Override Royalty"—provides that he is to be paid "on net sales of full-priced top line records embodying the Album by the Record Label *through normal retail channels in the United States*[13] in the amount of two percent (2.0%) of SRLP[14] . . . ." This context is crucial, and the term "other sales (including foreign sales)" is referring to the kind of market or retail channel—such as foreign markets—for sales of the entire Album, *not*

---

[12] *See Archer W. Contractors, Ltd. v. Estate of Pitts*, 292 Ga. 219, 224 (2) (735 SE2d 772) (2012) (holding that the context in which a contractual term appears always must be considered in determining the meaning of the term); *Willesen v. Ernest Commc'n, Inc.*, 323 Ga. App. 457, 460 (1) (746 SE2d 755) (2013) (noting that rules of contract interpretation "require us to interpret any isolated clauses and provisions of the contract in the context of the agreement as a whole"); *see also Anderson v. Anderson*, 274 Ga. 224, 227 (3) (552 SE2d 801) (2001) ("Words, like people, are judged by the company they keep").

[13] (Emphasis supplied.)

[14] As noted elsewhere in the agreement, "SRLP" is shorthand for "suggested retail list price."

to that which is being sold. So, despite Copeland's alternative hypothetical interpretation, "we are not at liberty to ignore the specific terms of the parties' written agreement and rewrite or revise a contract under the guise of construing it."[15] Accordingly, the trial court did not err in ruling that the unambiguous language in the September 2007 agreement provides that Copeland is to be paid for sales of the entire Album *and* individual recordings from the Album *prior* to HGM signing a contract with a record company but *only* for sales of the entire Album subsequent to such a signing.[16]

2. Copeland also maintains that the trial court erred in granting summary judgment as to his claim that HGM's initial failure to pay the merchandise royalties

---

[15] *Miller v. GGNSC Atlanta, LLC*, 323 Ga. App. 114, 123 (2) (746 SE2d 680) (2013) (punctuation omitted); *accord Bearoff v.Craton*, 350 Ga. App. 826, 834 (1) (830 SE2d 362) (2019).

[16] *See Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co., Inc.*, 288 Ga. 749, 750 (707 SE2d 369) (2011) ("If the language is unambiguous, the court simply enforces the contract according to the terms, and looks to the contract alone for the meaning." (punctuation omitted)); *Bearoff*, 350 Ga. App. at 834 (1) (affirming the trial court's grant of summary judgment as to contract claim on the ground that when "the language at issue is plain and unambiguous, we presume that the parties meant what they said and we simply enforce the contract as written"). Because the relevant contract language is unambiguous, we need not address Copeland's remaining argument that "[t]he rules of contract construction and parole evidence do not resolve the ambiguity in favor of excluding sales of individual songs."

15

it acknowledged that he was owed warranted an award of attorney fees under OCGA § 13-6-11. Again, we disagree.

OCGA § 13-6-11 provides that "[t]he expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." And questions concerning bad faith, stubborn litigiousness, or unnecessary trouble and expense, under OCGA § 13-6-11, are "generally questions for the jury to decide."[17] Nevertheless, if there is no evidence of bad faith or stubborn litigiousness, a court should "grant a defendant's motion for summary judgment on a claim for attorney fees."[18]

Here, Copeland claims that the trial court erred in denying his claim for attorney fees under OCGA § 13-6-11, specifically arguing that HGM acted in bad faith *and* caused him unnecessary trouble and expense when it failed to immediately

---

[17] *Garrett v. Women's Health Care of Gwinnett, P.C.*, 243 Ga. App. 53, 54-55 (1) (532 SE2d 164) (2000) (punctuation omitted).

[18] *Id.* at 55 (1) (punctuation omitted); *accord Nash v. Reed*, 349 Ga. App. 381, 383 (1) (825 SE2d 853) (2019).

16

pay him several quarters worth of merchandise royalties that it acknowledged he was owed.

(a) *Bad-faith Claim*. As to Copeland's bad-faith claim, this Court has held that "bad faith warranting an award of attorney fees must have arisen out of the transaction on which the cause of action is predicated."[19] Importantly, a mere refusal to pay a just debt, standing alone, is "insufficient to support an award of attorney fees under OCGA § 13-6-11."[20] But such a refusal may be sufficient when "it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive."[21]

In this case, after Copeland informed HGM that he had not been paid royalties on merchandise sales for several quarters, HGM acknowledged the oversight and explained that it was a result of the company's transition of its accounting operations from an outside accounting firm—to whom Copeland directed his initial inquiries about the payments—to an internal accounting department. In addition, HGM

---

[19] *Steel Magnolias Realty, LLC v. Bleakley*, 276 Ga. App. 155, 156 (1) (622 SE2d 481) (2005) (punctuation omitted).

[20] *Fresh Floors, Inc. v. Cambridge Apartments, LLC*, 257 Ga. App. 270, 271 (570 SE2d 590) (2002).

[21] *Id.*

17

promptly provided Copeland and his legal counsel with sales statements for the relevant quarters and offered to pay the amounts due under those statements. Copeland, nonetheless, asserts that HGM's request that he sign a release after determining the exact amount owed is evidence of bad faith. But this request was prompted by Copeland's counsel sending HGM a draft complaint with his demand letter, in which he alleged that past accountings were not always accurate. Thus, at this point, Copeland was arguably threatening litigation, and "bad faith"—as contemplated by OCGA § 13-6-11—does not encompass bad faith in defending a claim after a cause of action has already arisen."[22] As a result, given these circumstances, we agree with the trial court that HGM's handling of Copeland's request for the royalty payments on merchandise sales was not in bad faith or the result of a sinister motive as a matter of law.[23]

---

[22] *Steel Magnolias Realty, LLC*, 276 Ga. App. at 157 (1); *see David G. Brown P.E., Inc. v. Kent*, 274 Ga. 849, 850 (561 SE2d 89) (2002) ("The elements which will authorize an award under OCGA § 13-6-11 have consistently been found to relate to the conduct arising from the transaction underlying the cause of action being litigated, not conduct during the course of the litigation itself."); *Nash*, 349 Ga. App. at 383 (1) (noting that bad faith under OCGA § 13-6-11,"pertains to the transaction out of which the cause of action arose, not to the defendant's conduct after the cause of action arose." (punctuation omitted)).

[23] *See Choate Constr. Co. v. Auto-Owners Ins. Co.*, 335 Ga. App. 331, 341 (3) (779 SE2d 465) (2015) (holding that trial court did not err in granting summary

18

(b) *Unnecessary Trouble and Expense Claim*. As to Copeland's argument that HGM caused him unnecessary trouble and expense, a recovery of attorney fees under OCGA § 13-6-11 for such a claim "is authorized [when] the evidence reveals no bona fide controversy or dispute with regard to the defendant's liability."[24] But importantly, when a bona fide controversy clearly exists between the parties, the defendant is "entitled to judgment as a matter of law on the plaintiff's claim for attorney fees and expenses of litigation based on stubborn litigiousness or the causing of unnecessary trouble and expense."[25]

In this matter, after HGM acknowledged its oversight regarding the royalties on merchandise sales it owed, it provided Copeland and his counsel with sales statements for the relevant quarters and offered to pay the amounts due under those

---

judgment to defendant on plaintiff's claim for attorney fees given that defendant had a good-faith basis for contesting whether it owed bond payments to plaintiff); *Steel Magnolias Realty, LLC*, 276 Ga. App. at 156-57 (1) (holding that summary judgment was warranted as to plaintiff's claim for attorney fees as there was no evidence that contract or breach thereof was made in bad faith); *Pulte Home Corp. v. Woodland Nursery*, 230 Ga. App. 455, 458 (4) (496 SE2d 546) (1998) ("A recovery of OCGA § 13-6-11 attorney's fees in a contract action must be based upon evidence which shows more than a mere breach of contract." (punctuation omitted)).

[24] *Steel Magnolias Realty, LLC*, 276 Ga. App. at 157 (2).

[25] *Choate Constr. Co.*, 335 Ga. App. at 341 (3) (punctuation omitted).

statements. Copeland and his counsel then questioned whether prior statements were accurate and threatened litigation, after which HGM deposited over $150,000 in the registry of the court. Thus, despite the fact that the parties ultimately agreed to a consent order awarding Copeland the royalties on merchandise sales, there was, initially, a bona fide controversy between them, and, consequently, Copeland is not entitled to attorney fees under OCGA § 13-6-11 as a matter of law.[26] As a result, the trial court did not err in granting summary judgment to HGM on that claim.

3. Copeland further contends that the trial court erred in granting summary judgment as to his claim that HGM's initial failure to pay the merchandise royalties it acknowledged that he was owed also warranted an award for prejudgment interest under OCGA § 13-6-13. Yet again, we disagree.

---

[26] *See Latham v. Faulk*, 265 Ga. 107, 108 (2) (454 SE2d 136) (1995) (holding that a bona fide controversy regarding existence and terms of contract to make will precluded award of attorney fees in suit for specific performance of contract); *Choate Constr. Co.*, 335 Ga. App. at 341-42 (3) (holding that trial court did not err in granting summary judgment to defendant on plaintiff's claim for attorney fees given that there was a genuine dispute between the parties); *Steel Magnolias Realty, LLC*, 276 Ga. App. at 157-58 (2) (holding that summary judgment was warranted as to plaintiff's claim for attorney fees as there was evidence of a bona fide controversy between the parties); *Grange Mut. Cas. Co. v. Kay*, 264 Ga. App. 139, 144 (5) (589 SE2d 711) (2003) (same).

Under OCGA § 13-6-13, "[i]n all cases where an amount ascertained would be the damages at the time of the breach, it *may* be increased by the addition of legal interest from that time until the recovery."[27] And this Code section is applicable to "unliquidated damages."[28] But while OCGA § 13-6-13 authorizes a separate award of prejudgment interest, it "does not *require* such an award."[29]

In this matter, the trial court determined that prejudgment interest was not warranted as a matter of law, and Copeland offers no support for his argument that the trial court was required to send this issue to a jury, when the very language of the statute provides that such an award is entirely discretionary.[30] Accordingly, the trial

---

[27] (Emphasis supplied).

[28] *Braner v. S. Trust Ins. Co.*, 255 Ga. 117, 119 (1) (335 SE2d 547) (1985); *accord Consulting Constr. Corp. v. Edwards*, 207 Ga. App. 296, 299 (3) (427 SE2d 789) (1993).

[29] *T & R Custom, Inc. v. Liberty Mut. Ins. Co.*, 227 Ga. App. 144, 147 (4) (488 SE2d 705) (1997) (emphasis supplied).

[30] *See Ferdinand v. City of East Point*, 301 Ga. App. 333, 338 (3) (687 SE2d 617) (2009) (holding that trial court had discretion to award interest under OCGA § 13-6-13 as a matter of law on summary judgment); *Walker v. Gwinnett Hosp. Sys., Inc.*, 263 Ga. App. 554, 559 (2) (588 SE2d 441) (2003) (finding that trial court was authorized to award prejudgment interest under OCGA §§ 7-4-15 and 13-6-13 on summary judgment); *Colonial Bank v. Boulder Bankcard Processing, Inc.*, 254 Ga. App. 686, 692 (7) (563 SE2d 492) (2002) (affirming trial court's award of interest under OCGA § 13-6-13 on summary judgment); *Reahard v. Ivester*, 188 Ga. App. 17,

21

court also did not err in granting summary judgment to HGM as to Copeland's claim for prejudgment interest under OCGA § 13-6-13.

4. Finally, Copeland contends that the trial court erred in awarding costs to HGM in its final judgment, arguing that the majority of those costs were not recoverable under OCGA § 9-15-11. We agree.

Following the trial court's grant of summary judgment in its favor, HGM filed a motion for costs under OCGA § 9-15-11, seeking to recover $2,362.26. The costs sought specifically included court reporter fees for depositions and the transcription of the summary-judgment hearing, filing fees, courier fees, and the costs of exhibit boards used during that hearing. And a few months later, the trial court issued an order awarding costs to HGM in the full amount sought of $2,362.26.

On appeal, Copeland argues that the trial court erred, claiming that only the filing fees were recoverable under the statute. And on this point, we agree with him.

19 (2) (371 SE2d 905) (1988) (holding that landlord suing to recover unpaid rent was entitled to recover interest on damages on summary judgment). *Cf. Consulting Constr. Corp.*, 207 Ga. App. at 299 (3) (noting that unlike interest awarded under OCGA § 13-6-13, interest awarded under OCGA § 7-4-15 is mandatory rather than discretionary). *See also Cartledge v. Montano*, 325 Ga. App. 322, 330 (3) (750 SE2d 772) (2013) (explaining that "in construing the language of a statute, the word 'shall' ordinarily denotes command and not permission, whereas 'may' ordinarily denotes permission and not command." (punctuation omitted)).

22

OCGA § 9-15-11, in relevant part, provides: "When a case is disposed of, the costs, including fees of witnesses, shall be included in the judgment against the party voluntarily dismissing, being involuntarily dismissed, or cast in the action." But not all expenses incurred by a party are "regarded as costs."[31] In fact, costs are generally limited to "those charges, fixed by statute, as compensation for services rendered by officers of the Court in the progress of the cause."[32] And the Supreme Court of Georgia has expressly held that the term "costs" does not include either deposition costs or the court reporter's take-down fee for transcribing the summary-judgment hearing for purposes of those costs assessed against a losing party in a civil matter.[33] Accordingly, we reverse the trial court's award of costs to HGM with the exception of the $104.83 award for the filing fees it incurred.

---

[31] *Bartelt v. Convergence.com Corp.*, 287 Ga. App. 871, 871 (652 SE2d 897) (2007) (punctuation omitted).

[32] *Id.* (punctuation omitted).

[33] *See City of Atlanta v. Int'l Ass'n of Firefighters, Local 134*, 240 Ga. 24, 26 (4) (b) (239 SE2d 353) (1977) (holding that expenses incurred in taking depositions and the take-down fee of the court reporter were not included as costs); *Bartelt*, 287 Ga. App. at 871 (same).

For all these reasons, we affirm the trial court's grant of summary judgment in favor of HGM, but we partially reverse its award of costs under OCGA § 9-15-11.

*Judgment affirmed in part and reversed in part. Barnes, P. J. and Pipkin, J., concur.*