**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and PINSON, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 12, 2021**

# In the Court of Appeals of Georgia

A21A0703. J.P. CAREY ENTERPRISES, INC. v. CUENTAS, INC.

DILLARD, Presiding Judge.

J.P. Carey Enterprises, Inc. filed suit against Cuentas, Inc., f/k/a Next Group Holdings, Inc., alleging that Cuentas defaulted on a convertible note. Both parties moved for summary judgment, and despite ruling that Cuentas breached the note, the trial court granted Cuentas's motion and denied JPC's motion, finding that the note's default provisions were unenforceable penalties rather than liquidated damages. On appeal, JPC contends the trial court erred in denying its motion for summary judgment and granting Cuentas's, arguing that the default provisions were enforceable liquidated damages and it did not waive default interest. JPC further contends the trial court erred in striking its expert witness's affidavit. For the reasons set forth *infra*, we affirm in part and reverse in part.

Viewed in the light most favorable to JPC,[1] the record shows that in 2015, the Circuit Court in Broward County, Florida, entered a judgment for $66,000 against Cuentas's predecessor, Next Group Holdings, Inc. The judgment holder assigned it to JPC, and on January 2, 2017, in an effort to resolve that judgment, JPC and Cuentas entered into an "8% Convertible Redeemable Note" with Cuentas agreeing to owe a principal balance of $70,000. Interest on the note's principal accrued at eight percent per annum, and it matured in seven months—on August 2, 2017. Additionally, the parties expressly agreed that the note would be governed by Georgia law.

Turning to its actual terms, the note was convertible in that it allowed JPC to convert any outstanding debt into an equity interest in Cuentas. As a result, under paragraphs 4 (a) and (b) of the note, Cuentas was to either pay JPC $70,000 plus eight percent interest by August 2, 2017, or issue JPC stock in Cuentas equal to the principal plus then-accrued interest within three days of a demand by JPC to convert the note to shares. Specifically, under paragraph 4 (a), if JPC elected to convert the note, it would receive the principal and currently accrued interest in Cuentas stock,

---

[1] *See, e.g.*, *Swanson v. Tackling*, 335 Ga. App. 810, 810 (783 SE2d 167) (2016).

2

priced at "50% of the lowest trading price" for "twenty prior trading days"[2] with a "floor of $0.02 per share." In addition, paragraph 4 (b) provided that "[JPC] may, at any time, send in a Notice of Conversion to [Cuentas] for Interest Shares based on the formula provided [for conversions of principal]. The dollar amount converted into Interest Shares shall be all or a portion of the accrued interest calculated on the unpaid principal balance of this Note to the date of such notice." Furthermore, the note required Cuentas to appoint a transfer agent and provide this agent with irrevocable instructions to reserve at least 10,000,000 shares of its common stock. The note also directed Cuentas to "reserve a minimum of four times the amount of shares required if the [note] would be fully converted." And in the event of a conversion, the note required Cuentas to pay "all transfer agent costs associated" with delivering the shares to JPC.

Paragraph 8 of the note described "Events of Default," which included the failure to reserve the required number of shares and the failure to deliver shares to JPC within three days of it providing a Notice of Conversion. In the event of a default "unless cured within 5 days" or unless "waived in writing," JPC could "consider this

---

[2] As noted *infra*, the note characterizes this period of time as the "lookback" period.

Note immediately due and payable" and pursue any of its available remedies. Most of these remedies are outlined in Paragraph 8, but the note initially states, in Paragraph 4 (a), that upon default "the conversion discount shall be increased by 10%, the lookback period will be increased to 25 days and the floor of $0.02 per share shall be eliminated." Paragraph 8 then provides that upon default "interest shall accrue at a default interest rate of 24% per annum."

Finally, the note outlines two specific remedies in the event Cuentas fails to deliver shares within three days of JPC issuing a Notice of Conversion. First, the note imposed what it characterized as a "penalty" of $250 per day beginning on the fourth day after notice and increasing to $500 per day upon the tenth day. Second, the note includes what it terms a "Make-Whole for Failure to Deliver Loss" remedy which provides:

> At [JPC's] election, if [Cuentas] fails for any reason to deliver to [JPC] the conversion shares by the 3rd business day following the delivery of a Notice of Conversion to [Cuentas] and if [JPC] incurs a Failure to Deliver Loss, then at any time [JPC] may provide [Cuentas] written notice indicating the amounts payable to [JPC] in respect of the Failure to Deliver Loss and [Cuentas] must make [JPC] whole as follows: Failure to Deliver Loss = [(High trade price at any time on or after the day of exercise) x (Number of conversion shares)]. [Cuentas] must pay the Failure to Deliver Loss by cash payment, and any such cash payment

4

must be made by the third business day from the time of [JPC's] written notice to [Cuentas].

Approximately one week following the note's execution, JPC received a letter from Cuentas, stating that it appointed a transfer agent and reserved 3,500,000 shares. At that time, JPC did not object to Cuentas's failure to comply with the note's 10,000,000 share reserve requirement.

On April 13, 2017, JPC sent a Notice of Conversion to Cuentas's transfer agent, seeking to convert $71,549.59 of the note ($70,000 in principal and $1,549.59 in interest at the non-default rate of 8 percent) into 3,577,480 shares of Cuentas's stock. A few days later, the transfer agent responded, via email, stating that it required a $250 conversion fee (contrary to the terms of the note) and informing JPC that Cuentas currently had only 3,500,000 shares in reserve. The agent, therefore, inquired if JPC wanted to submit a revised Notice of Conversion for that number of shares or if it wanted Cuentas to issue an additional 77,480 shares. On April 27, 2017, JPC sent an updated Notice of Conversion to the agent, accounting for the agent's requested fee and the additional interest that had accrued since the April 13 Notice. Thus, JPC now sought to convert $72,014.38 into 3,600,720 shares, again using the note's standard conversion formula and its non-default interest rate.

Nonetheless, that same day, the agent again responded that Cuentas only had 3,500,000 shares in reserve and asked JPC if it would accept that amount or if it wanted JPC to issue an additional 100,720 shares and/or increase the reserve. And over the course of the next two months, similar inquiries by JPC were met with a similar response, with no progress being made. Finally, on June 29, 2017, after yet another email from the agent stating that Cuentas only currently had 3,500,000 shares reserved, JPC responded with an email, exhorting, "SEND THE 3.5MM PLEASE I WILL DEAL W. REST AND OPINION LATER." But the next day, before receiving JPC's revised Notice of Conversion, the transfer agent contacted Cuentas, notifying it of JPC's request for 3,600,720 shares and requesting authorization to issue additional shares. That same day, JPC emailed Cuentas, reminding it that the note required 10,000,000 shares to be in reserve and requesting that such shares be issued. The email concluded by stating, "If this is not agreeable I am still demanding that at a minimum the 3.5mm be sent immediately." The following day, Cuentas authorized the issuance of the additional 100,720 shares necessary to comply with JPC's April 27 Notice of Conversion. And on July 5, 2017, JPC received the entirety of the 3,600,720 shares it requested.

Nearly six months later, on December 1, 2017, JPC sent a demand to Cuentas for what it termed "penalties due" for Cuentas's breaches of the note, specifically its failure to maintain the minium reserve amount of shares and its failure to timely deliver shares after JPC's Notice of Conversion. In the demand, JPC calculated the purported amount owed by applying the note's Default Conversion Formula, Failure to Deliver Daily Penalty, and the Make-Whole provision. JPC also applied the default interest, resulting, it claimed, in a total amount owed of $305,368.63. But Cuentas refused JPC's demand.

On December 14, 2018, JPC filed a lawsuit against Cuentas, alleging that Cuentas breached the note in several respects and requesting damages well in excess of $1,000,000 under the note's various default provisions. Cuentas filed an answer, and discovery ensued. On June 21, 2019, the trial court issued a scheduling order, in which it set deadlines for discovery and dispositive motions. But a few months later, the parties filed a joint motion to modify that order, seeking an extension on the various deadlines set by the June 21 order. On November 15, 2019, the trial court granted that motion, and the modified scheduling order set deadlines as follows: "Complete Party document productions and depositions" by November 19, 2019;

7

"Mediate" by December 20, 2019; and "Daubert and dispositive motions" by January 24, 2020.

On January 15, 2020, JPC amended its complaint so that it was no longer seeking damages under the note's "Failure to Deliver Daily Penalty." Subsequently, on January 24, 2020, both parties filed motions for summary judgment. Specifically, JPC argued that Cuentas breached the terms of the note and, thus, it was entitled to damages under the note's default provisions. In turn, Cuentas argued, *inter alia*, that the note's default provisions were unenforceable penalties rather than lawful liquidated damages clauses. And in the subsequent weeks, the parties filed responses to each other's summary judgment motions.

On April 27, 2020, JPC filed a motion requesting permission to file a reply brief, in which it attached the expert affidavit of John F. Coyle, a professor of law, who had written articles on convertible notes similar to the one at issue. Cuentas filed a motion to strike the affidavit, contending it was untimely and that—although the affidavit had been executed on March 2, 2020—it had not been made aware of JPC's intent to call Professor Coyle as an expert witness until JPC filed the April 27 motion.

The trial court[3] agreed, granting Cuentas's motion to strike. And approximately one month later, on October 7, 2020, the trial court issued an order granting Cuentas's motion for summary judgment on the ground that the note's default provisions were unenforceable penalties and denying JPC's motion on those same grounds. This appeal follows.

Summary judgment is, of course, proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4] If summary judgment is granted, it enjoys no presumption of correctness on appeal, and an appellate court must satisfy itself that the requirements of OCGA § 9-11-56 (c) have been met.[5] And in conducting this *de novo* review, we are charged with "viewing the evidence, and all reasonable

---

[3] While Cuentas's motion to strike and the cross-motions for summary judgment were pending, the case was transferred to the newly established Business Case Division of the Superior Court of Fulton County.

[4] OCGA § 9-11-56 (c).

[5] *See Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) ("Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met.").

9

conclusions and inferences drawn from the evidence in the light most favorable to the nonmovant."[6] Bearing these guiding principles in mind, we turn to JPC's claims of error.

1. JPC first contends that the trial court erred in denying its motion for summary judgment and granting Cuentas's, arguing that the note's Default-Conversion and Make-Whole provisions were lawful liquidated-damages clauses rather than unenforceable penalties. We disagree.

OCGA § 13-6-7 provides that "[i]f the parties agree in their contract what the damages for a breach shall be, they are said to be liquidated and, unless the agreement violates some principle of law, the parties are bound thereby." And under Georgia law, "[i]n deciding whether a contract provision is enforceable as liquidated damages, three factors must exist."[7] Specifically, "[t]he injury must be difficult to estimate accurately, the parties must intend to provide damages instead of a penalty, and the

---

[6] *Benefield v. Tominich*, 308 Ga. App. 605, 607 (1) (708 SE2d 563) (2011) (punctuation omitted); *accord Swanson*, 335 Ga. App. at 810.

[7] *AFLAC, Inc. v. Williams*, 264 Ga. 351, 354 (2) (444 SE2d 314) (1994) (punctuation omitted); *accord MMA Cap. Corp. v. ALR Oglethorpe, LLC*, 336 Ga. App. 360, 363 (1) (785 SE2d 38) (2016); *see Se. Land Fund, Inc. v. Real Estate World, Inc.*, 237 Ga. 227, 230 (227 SE2d 340) (1976) (holding that "in deciding whether a contract provision is enforceable as liquidated damages, the court makes a tripartite inquiry").

10

sum must be a reasonable estimate of the probable loss."[8] In addition, the party who

defaults on the contract has "the burden of proving the liquidated damages clause is

an unenforceable penalty."[9] But the defaulting party can carry this burden by "proving

any of the three factors is lacking."[10] Ultimately, the enforceability of a

liquidated-damages provision in a contract is "a question of law for the court."[11] And

in cases of doubt, the courts "favor the construction [of a contract] which holds the

stipulated sum to be a penalty, and limits the recovery to the amount of damage

actually shown, rather than a liquidation of the damages."[12] Applying this three-part

---

[8] *Williams*, 264 Ga. at 354 (2) (punctuation omitted); *accord MMA Cap. Corp.*, 336 Ga. App. at 363 (1).

[9] *Ultra Grp. of Cos., Inc. v. S&A 1488 Mgmt., Inc.*, 357 Ga. App. 757, 759 (1) (849 SE2d 531) (2020) (punctuation omitted).

[10] *Id.* at 760 (1) (punctuation omitted).

[11] *Liberty Life Ins. Co. v. Thomas B. Hartley Constr. Co.*, 258 Ga. 808, 809 (375 SE2d 222) (1989) (punctuation omitted); *accord MMA Cap. Corp.*, 336 Ga. App. at 363 (1).

[12] *Fortune Bridge Co. v. Dep't of Transp.*, 242 Ga. 531, 532 (250 SE2d 401) (1978) (punctuation omitted); *see Ultra Grp. of Cos., Inc.*, 357 Ga. App. at 760 (1) (noting that "[i]n close cases involving a liquidated damage clause, the Georgia Supreme Court has advocated interpreting the clause as a penalty" (punctuation omitted)).

11

test to the note's Default-Conversion formula and the Make-Whole provision, we find that the trial court did not err.[13]

(a) *Whether Damages Were Difficult to Estimate.* Contrary to JPC's contention, the damages for Cuentas's breach of the note were not difficult to estimate at the time it was executed. Indeed, nearly 100 years ago in *Brandt v. Buckley*, this Court held that "[i]n case of a nondelivery of stock in accordance with the contract, if the purchase-price has been paid, the general measure of damages is the actual or market value of the stock at the time when delivery should have been made, or, in other words, at the time of the breach of the contract."[14] In fact, we expressly noted that "[t]he claim of the buyer for damages for the failure of the seller to make delivery is ordinarily a claim for unliquidated damages. . . ."[15] And when the buyer has paid the purchase price, and stands on the contract, as by suing for its breach, he "must be

---

[13] In its summary-judgment order, the trial court found that the note's default interest was *not* an unenforceable penalty but that JPC waived its enforcement. Cuentas has not cross-appealed on the first aspect of this ruling and, thus, the issue is not before us. We address whether JPC waived enforcement of the provision in Division 2, *infra*.

[14] 27 Ga. App. 515, 519-20 (109 SE 692) (1921) (punctuation omitted).

[15] *Id.* at 519 (punctuation omitted).

12

content if the law places him in the position he would have occupied if the contract had been performed."[16]

JPC balks at the age of our holding in *Brandt*, and notes that neither *Brandt* nor any other Georgia appellate opinion has addressed a convertible note quite like the one before us. Specifically, JPC argues that its potential gains were impossible to estimate at the time the note was executed given the volatility of the price for Cuentas's stock. But although JPC is correct that no Georgia case has addressed this exact issue, numerous federal cases applying New York law have done so and flatly rejected its argument that such damages are difficult to estimate.[17] We find these opinions persuasive, consistent with our holding in *Brandt*, and so we apply the reasoning of those cases here.[18] In fact, similar to Georgia, "[t]he law of New York

---

[16] *Id.* at 520 (punctuation omitted); *see Goody Prods., Inc. v. Dev. Auth. of City of Manchester*, 320 Ga. App. 530, 539 (3) (a) (740 SE2d 261) (2013) (noting that "[t]he injured party, as much as it is possible to do so with a monetary award, is to be placed in the position he would have been in had the contract been performed" (punctuation omitted)).

[17] *See infra* note 28 & accompanying text.

[18] *See Nat'l Serv. Indus., Inc. v. Here To Serve Rest., Inc.*, 304 Ga. App. 98, 103 (695 SE2d 669) (2010) (explaining that because no other Georgia case concerned the enforceability of liquidated-damage provisions in linen-service contracts, we examined cases from other jurisdictions that had done so).

provides that a contractually agreed upon sum for liquidated damages will be sustained where (1) actual damages may be difficult to determine and (2) the sum stipulated is not plainly disproportionate to the possible loss."[19] Also, as in Georgia, New York courts will "construe a purported liquidated damages provision strictly."[20] And when the damages flowing from a breach of a contract are easily ascertainable, or the damages fixed are plainly disproportionate to the contemplated injury, the "stipulated sum will be treated as a penalty and disallowed."[21] Furthermore, if a purported liquidated damages clause is "intended to operate as a means to compel performance, it will be deemed a penalty and will not be enforced."[22]

With specific regard to convertible notes such as the note at issue here, those courts have held when "the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure

---

[19] *U.S. Fid & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F3d 34, 70 (II) (B) (2d Cir. 2004) (punctuation omitted).

[20] *Id.* at 71 (II) (B) (citations and punctuation omitted).

[21] *Id.* (punctuation omitted).

[22] *Rattigan v. Commodore Int'l Ltd.*, 739 FSupp 167, 169 (S.D. N.Y. 1990) (punctuation omitted).

of damages."[23] Thus, the damage award resulting from a breach of an agreement to purchase securities is "the difference between the contract price and the fair market value of the asset at the time of breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach."[24] So, the fact that the selling entity's future share value is unknowable is "irrelevant to whether actual damages are ascertainable[.]"[25] Indeed, that the quantum is unknown "does not make the damages difficult to determine."[26] Rather, what must be ascertainable is "the measure of actual damages."[27] And given that the note here is similar to the notes at issue in the federal cases applying New York law, we similarly conclude that JPC's actual damages are a function of readily determinable information, and therefore, the

---

[23] *LG Cap. Funding, LLC v. CardioGenics Holdings, Inc.*, 16-CV-1215, 2018 WL 1521861, at *7 (II) (C) (1) (E.D. N.Y. Feb. 20, 2018) (punctuation omitted), *rev'd on other grounds by* 787 Fed.Appx. 2 (2d Cir. 2019); *accord Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F2d 820, 825 (2d Cir. 1990).

[24] *CardioGenics Holdings, Inc.*, 2018 WL 1521861, at *7 (II) (C) (1) (punctuation omitted); *accord Sharma*, 916 F2d at 825; *LG Cap. Funding, LLC v. 5Barz Int'l, Inc.*, 307 FSupp3d 84, 103 (III) (B) (2) (E.D. N.Y. 2018); *Union Cap. LLC v. Vape Holdings, Inc.*, No. 16-CV-1343, 2017 WL 1406278, at *7 (IV) (B) (2) (S.D. N.Y. Mar. 31, 2017).

[25] *CardioGenics Holdings, Inc.*, 2018 WL 1521861, at *8 (II) (C) (1).

[26] *Id.* (punctuation omitted).

[27] *Id.*

trial court did not err in finding that the damages resulting from a breach of the note were not difficult to estimate.[28]

(b) *Whether Default Provisions Were Intended as a Penalty*. Under Georgia law, whether a provision represents liquidated damages or a penalty "does not depend upon the label the parties place on the payment but rather depends on the effect it was intended to have and whether it was reasonable."[29] And it is well established that we

---

[28] *See Adar Bays, LLC v. GenSYS ID, Inc.*, 341 FSupp3d 339, 349-50 (II) (A) (iv) (2) (S.D. N.Y. 2018) (holding that convertible note's "failure to deliver loss" and "make whole" provisions were "inappropriate when, as here, plaintiff's actual damages are a function of readily determinable information" (punctuation omitted)); *5Barz Int'l, Inc.*, 307 FSupp3d at 103 (III) (B) (2) (concluding that plaintiff's damages, which were a function of conversion price for stock, were easy to determine and, thus, the "Failure to Deliver Loss and Make-Whole" provision of the convertible note constitutes an unenforceable penalty); *CardioGenics Holdings, Inc.*, 2018 WL 1521861, at *8 (II) (C) (1) (finding liquidated-damages provisions in convertible note to be unenforceable penalties given that plaintiff's damages were easily ascertainable based on market value of stock at time of breach); *Union Cap.*, 2017 WL 1406278, at *7 (IV) (B) (2) (concluding that "determining damages in the event of a failure to deliver converted shares was no more complicated or ephemeral than the method of calculating the conversion in the first place"); *see also Brandt*, 27 Ga. App. at 519 (holding that in case of a nondelivery of stock, the general measure of damages is the actual or market value of the stock at the time of the breach of the contract).

[29] *Se. Land Fund, Inc.*, 237 Ga. at 228; *accord MMA Cap. Corp.*, 336 Ga. App. at 366 (2).

"ascertain the intent of the parties by first looking to the language of the contract."[30] Furthermore, although the words used by the parties are not conclusive, they are "a significant factor in determining the parties' intent."[31] Importantly, there must be "some manifestation of the parties' intent to agree on liquidated damages."[32]

In this matter, the note contains several provisions that are, in fact, characterized as penalties, including the Failure to Deliver Daily Penalty, which JPC ultimately removed from its complaint as a means by which it sought damages. And although the Default-Conversion and Make-Whole provisions were not characterized by the note as penalties, there is no language in the contract showing that the parties intended these provisions to be liquidated damages rather than a penalty.[33] Furthermore, much of the extrinsic evidence is less equivocal. For instance, in its

---

[30] *JR Real Estate Dev., LLC v. Cheeley Inv., L.P.*, 309 Ga. App. 250, 253 (1) (b) (709 SE2d 577) (2011) (punctuation omitted); *accord Mariner Health Care Mgmt. Co. v. Sovereign Healthcare*, 306 Ga. App. 873, 876 (1) (703 SE2d 687) (2010).

[31] *JR Real Estate Dev., LLC*, 309 Ga. App. at 253 (1) (b) (punctuation omitted); *accord Mariner Health Care Mgmt. Co.*, 306 Ga. App. at 876 (1).

[32] *Daniels v. Johnson*, 191 Ga. App. 70, 72 (1) (381 SE2d 87) (1989).

[33] *See id.* (noting that absence of language in contract characterizing non-refundable advance payment provision to be liquidated damages, while not dispositive, was a critical factor in determining intent of the parties).

December 1, 2017 email to Cuentas, JPC explicitly stated: "Demand is made here for penalties due under the settlement note." The email further warns that if JPC's initial calculations as to shares owed is not accepted it will be recalculated under the "'Make whole' penalties." In addition, the worksheet outlining JPC's calculation of its damages refers to both the Default-Conversion and the Make-Whole provisions as penalties. Finally, in his 30 (b) (6) deposition, JPC's president repeatedly referred to the various default provisions as penalties, at one point explaining that "[t]he penalties are specifically there to encourage [Cuentas] to act responsibly." Given these circumstances, the Default-Conversion and the Make-Whole provisions were intended to compel performance, and when "a designated sum is inserted into a contract for the purpose of deterring one or both of the parties from breaching it, it is a penalty."[34]

_____

[34] *Id.* at 71 (1) (punctuation omitted) (holding that lack of language in contract referring to damages provision as liquidated and defendant's testimony initially characterizing provision as a penalty negated the presence of any intent by the parties to liquidate the damages); *see also Ultra Grp. of Cos., Inc.*, 357 Ga. App. at 759 (1) (noting that "[i]n close cases involving a liquidated damage clause, the Georgia Supreme Court has advocated interpreting the clause as a penalty" (punctuation omitted)). *Cf. Mariner Health Care Mgmt. Co.*, 306 Ga. App. at 876 (1) (concluding that damages provision was not intended to be a penalty based on fact that contract expressly described payment as "liquidated damages" and testimony from officers who negotiated the contract that liquidated-damages provision was intended to compensate plaintiff in the event of early termination).

(c) *Whether the Default Provisions Were a Reasonable Estimate of the Probable Loss*. The third prong of the test "inquires whether the liquidated damage amount is a reasonable pre-estimate of the probable loss."[35] In this regard, the touchstone question is whether "the parties employed a reasonable method under the circumstances to arrive at a sum that reasonably approximates the probable loss."[36] And when the amount of liquidated damages plainly has "no reasonable relation to any probable actual damage which may follow a breach, the contractual provision will be construed as an unenforceable penalty."[37] Moreover, a term fixing unreasonably large liquidated damages is "unenforceable on grounds of public policy as a penalty."[38]

Here, JPC's damages for Cuentas's failure to deliver shares was easily estimated as the difference between the contract price and the fair market value of the

---

[35] *Caincare, Inc. v. Ellison*, 272 Ga. App. 190, 192 (1) (612 SE2d 47) (2005).

[36] *Mariner Health Care Mgmt. Co.*, 306 Ga. App. at 876 (1) (punctuation omitted).

[37] *Nat'l Serv. Indus., Inc.*, 304 Ga. App. at 104 (punctuation omitted).

[38] *Williams*, 264 Ga. at 354 (2) (punctuation omitted); *accord* Restatement (Second) of Contracts § 356 (1) (2021).

19

shares at the time of breach.[39] Nevertheless, JPC readily acknowledges that it did not estimate its probable losses in that way but, rather, as demonstrated in its worksheet, by devising a formula that would transform a $70,000 convertible note into an award of more than $50,000,000. In fact, instead of relating to any actual loss, by eliminating the $0.02 floor and increasing the share discount to 60 percent, the note's Default-Conversion provision ensures that JPC obtains a guaranteed greater return than if there had not been a breach at all. Similarly, the Make-Whole provision does not reasonably approximate any loss suffered by JPC. Again, we find the federal cases applying New York law to be persuasive when—in interpreting a nearly identical Make-Whole clause—they held that "the formula was designed to provide plaintiff with a guaranteed higher cash payout than a true make-whole measure, which would focus only on plaintiff's loss as a result of defendant's failure to abide by the terms of the bargain."[40] Consequently, we also find that "the so-called 'Make-Whole' provision of the Note is nothing of the sort and is instead an

---

[39] *See supra* notes 23, 24, & accompanying text.

[40] *Adar Bays, LLC*, 341 FSupp3d at 350 (II) (A) (iv) (2) (punctuation omitted); *accord 5Barz Int'l, Inc.*, 307 FSupp3d at 103 (III) (B) (2); *Union Cap.*, 2017 WL 1406278, at *7 (IV) (B) (2).

unenforceable penalty."[41] Thus, the trial court did not err in finding that the note's Default-Conversion and Make-Whole provisions were not a reasonable pre-estimate of JPC's probable loss.[42]

In summary, although the trial court was only required to find that the note's Default-Conversion and Make-Whole provisions lacked any one of the hallmarks of a lawful liquidated damages provision,[43] here, it correctly concluded those provisions lacked all three. Accordingly, the trial court did not err in granting summary judgment on the ground that the aforementioned provisions were unenforceable penalties.

---

[41] *Union Cap.*, 2017 WL 1406278, at *7 (IV) (B) (2).

[42] *See Nat'l Serv. Indus., Inc.*, 304 Ga. App. at 104 (holding that no evidence showed reasonableness of liquidated-damages provision as an estimate of probable loss); *Caincare, Inc.*, 272 Ga. App. at 194-95 (1) (hold that defendant carried its burden by proving the sum was an "unreasonable estimate of the probable loss" and, thus, an unenforceable penalty); *see also Adar Bays, LLC*, 341 FSupp3d at 350 (II) (A) (iv) (2) (holding that Make-Whole provision in note was an unenforceable penalty as it did not reasonably estimate plaintiff's probable loss in the event of default); *accord 5Barz Int'l, Inc.*, 307 FSupp3d at 103 (III) (B) (2) (same); *Union Cap.* 2017 WL 1406278, at *7 (IV) (B) (2) (same). *Cf. Mariner Health Care Mgmt. Co.*, 306 Ga. App. at 876 (1) (holding that because plaintiff presented evidence that the actual profit margin under the contract, prior to its termination, was approximately 48.5 percent, liquidated damages in the amount of 50 percent of remaining fees under the contract was a reasonable pre-estimate of probable loss).

[43] *See Ultra Grp. of Cos.*, 357 Ga. App. at 760 (1) (noting that "[a] defaulting party can carry this burden by proving any of the three factors is lacking." (punctuation omitted)).

21

2. JPC also contends that the trial erred in granting Cuentas's motion for summary judgment on the ground that JPC waived the Default-Interest provision. We agree that genuine questions of material fact remain as to this issue.

It is true that a party to a contract "may waive a contractual right, and that any such waiver may be accomplished expressly or implicitly through the party's conduct."[44] Nevertheless, the law will not "infer the waiver of an important contract right unless the waiver is clear and unmistakable."[45] Furthermore, because waiver is not favored under the law, the evidence relied upon to prove a waiver "must be so clearly indicative of an intent to relinquish a then known particular right or benefit as to exclude any other reasonable explanation."[46] Put simply, all of the attendant facts, taken together, "must amount to an intentional relinquishment of a known right,

---

[44] *Vratsinas Constr. Co. v. Triad Drywall, LLC*, 321 Ga. App. 451, 453-54 (1) (739 SE2d 493) (2013); *see Yash Sols., LLC v. N.Y. Global Consultants Corp.*, 352 Ga. App. 127, 132 (1) (a) (834 SE2d 126) (2019) (noting that waiver of a contract provision may be "express, or may be inferred from actions, conduct, or a course of dealing" (punctuation omitted)).

[45] *Vratsinas Constr. Co.*, 321 Ga. App. at 454 (1) (punctuation omitted); *accord Miller v. Hiawassee Allen Family, LLC*, 357 Ga. App. 770, 772 (849 SE2d 500) (2020).

[46] *Vratsinas Constr. Co.*, 321 Ga. App. at 454 (1) (punctuation omitted); *accord Miller*, 357 Ga. App. at 772.

in order that a waiver may exist."[47] And significantly, when the evidence is in conflict, "the issue of waiver must be decided by the jury."[48]

Here, Paragraph 10 of the note provides: "Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder." Additionally, the final section of Paragraph 8, in explaining the possible consequences of default, first caveats "[u]nless such Event of Default shall have been waived in writing by the Holder . . ." Yet it is undisputed that there is no evidence JPC ever expressly provided Cuentas with a written waiver or relinquishment of any of the note's provisions. Nonetheless, the trial court found that JPC waived its right to assert the Default-Interest provision through its conduct. Specifically, the court ruled that JPC waived this right because it initially sought only non-default interest even after being made aware of Cuentas's breach of several of the note's terms and eventually accepted non-default interest after months of the email exchanges discussed *supra*. To be sure, a party may waive

---

[47] *Vratsinas Constr. Co.*, 321 Ga. App. at 454 (1) (punctuation omitted); *accord Miller*, 357 Ga. App. at 772.

[48] *Yash Solutions, LLC*, 352 Ga. App. at 134 (1) (a) (punctuation omitted); *accord BCM Constr. Grp. v. Williams*, 353 Ga. App. 811, 815 (1) (840 SE2d 51) (2020).

23

a contract through its conduct.[49] Moreover, an anti-waiver provision in a contract "can also be waived."[50] But here, there is evidence in conflict that requires this issue be resolved by a jury.

First, the note itself, in Paragraph 4, provides that JPC was "entitled, at its option, at any time, to convert all or *any* amount of the principal . . ."[51] And although, as the trial court found, JPC did accept fewer shares than owed at the non-default interest rate, in doing so, there is evidence suggesting that JPC was, nonetheless, reserving its other rights, stating, "SEND THE 3.5MM PLEASE I WILL DEAL W. REST AND OPINION LATER." Furthermore, in addition to JPC's president—the author of the aforementioned email—denying that he intended to waive any of the default provisions, Cuentas's 30 (b)(6) representative conceded when he testified that he did not construe the same email exchange as evidence that JPC waived its claim to additional shares. Given the foregoing, we cannot conclude as a matter of law that the evidence is "so clearly indicative of an intent to relinquish a then known

---

[49] *See supra* note 44 & accompanying text.

[50] *BCM Constr. Grp.*, 353 Ga. App. at 815 (1).

[51] (Emphasis added).

particular right or benefit as to exclude any other reasonable explanation."[52] Accordingly, whether JPC waived its entitlement to the note's default interest by its conduct in initially accepting fewer shares is a jury issue, and the trial court erred in ruling otherwise.[53]

3. JPC further argues that the trial court erred in striking the affidavit of its expert witness, Professor Coyle. We disagree.

It is well established that "[i]n civil cases, a trial court has broad discretion to control the sequence and timing of discovery, and to establish pretrial procedure."[54]

---

[52] *Vratsinas Constr. Co.*, 321 Ga. App. at 454 (1) (punctuation omitted); *accord Miller*, 357 Ga. App. at 772.

[53] *See Smith v. Gen. Fin. Corp. of Ga.*, 243 Ga. 500, 501 (255 SE2d 14) (1979) (holding that even evidence of seller's acceptance of buyer's repeated, late, irregular payments still created a factual dispute precluding summary judgment given anti-waiver provision in contract); *WPD Ctr., LLC v. Watershed, Inc.*, 330 Ga. App. 289, 291-92 (2) (765 SE2d 531) (2014) (holding that provision in lease providing that no waiver shall be deemed unless done so in writing, as well as other conflicting evidence as to whether lessor waived rights, created a jury issue and, thus trial court erred in finding that lessor waived rights as a matter of law); *see also BCM Constr. Grp.*, 353 Ga. App. at 815-16 (1) (concluding that factual questions remained as to whether appellee's conduct waived strict compliance with the closing date in contract, and therefore, the trial court erred in granting judgment on the pleadings on issue).

[54] *Lee v. Smith*, 307 Ga. 815, 820-21 (2) (838 SE2d 870) (2020) (punctuation omitted); *accord Rivera v. Washington*, 298 Ga. 770, 777-78 (784 SE2d 775) (2016); *see* OCGA § 9-11-26 (d) ("Unless the court, upon motion, for the convenience of parties and witnesses and in the interests of justice, orders otherwise, methods of

25

Importantly, this broad discretion "extends to the setting of pretrial scheduling deadlines and other matters of case management."[55] And once a trial court has properly exercised its discretion to enter an order setting a scheduling deadline, "compliance with that order is of paramount importance, as a party's failure to comply with it could subject that party to sanctions, including the harsh sanction of excluding a proffered witness from testifying at trial."[56] Nevertheless, a trial court's "discretion in fashioning an appropriate sanction for a party's failure to comply with a proper scheduling, discovery, or case management order is not unlimited."[57] As the Supreme Court of Georgia has cautioned, "no harsher sanctions should be imposed than are necessary to vindicate the court's authority."[58]

---

discovery may be used in any sequence; and the fact that a party is conducting discovery, whether by deposition or otherwise, shall not operate to delay any other party's discovery."); OCGA § 9-11-16 (a) (5) ("Upon the motion of any party, or upon its own motion, the court shall direct the attorneys for the parties to appear before it for a conference to consider . . . [s]uch other matters as may aid in the disposition of the action.").

[55] *Lee*, 307 Ga. at 821 (2); *see Martin v. Fulton Cty. Bd. of Registration & Elections*, 307 Ga. 193, 211 (2) (835 SE2d 245) (2019) ("[T]rial courts have broad discretion over the types of scheduling and discovery-related issues.").

[56] *Lee*, 307 Ga. at 821 (2).

[57] *Id.*

[58] *Id.*; *accord Ambler v. Archer*, 230 Ga. 281, 289 (1) (196 SE2d 858) (1973).

26

With regard to excluding an expert witness for failure to timely disclose that expert, our Supreme Court has recently held, in *Lee v. Smith*,[59] that when a "trial court defaults to the most extreme sanction available based solely upon a party's failure to meet a deadline in a scheduling order without considering any other factors, that court will have abused its discretion."[60] Going forward, the Court further held that

> when determining whether to exclude a witness who was not timely identified in compliance with a pretrial scheduling, discovery, or case management order, a trial court should consider: (1) the explanation for the failure to disclose the witness, (2) the importance of the testimony, (3) the prejudice to the opposing party if the witness is allowed to testify, and (4) whether a less harsh remedy than the exclusion of the witness would be sufficient to ameliorate the prejudice and vindicate the trial court's authority.[61]

In this matter, on November 15, 2019, the trial court issued a modified scheduling order that set deadlines as follows: "Complete Party document productions and depositions" by November 19, 2019; "Mediate" by December 20,

---

[59] 307 Ga. 815.

[60] *Lee*, 307 Ga. at 821-22 (2); *accord Haskins v. Ga. Neurological Inst., P.C.*, 355 Ga. App. 781, 785 (4) (845 SE2d 770) (2020).

[61] *Lee*, 307 Ga. at 824 (3).

2019; and "Daubert and dispositive motions" by January 24, 2020. But despite these deadlines, as well as Cuentas's discovery request that JPC disclose any expert witnesses it intended to call, JPC did not have Professor Coyle—its expert on the industry use of convertible notes (such as the note at issue)—execute an expert affidavit until March 2, 2020, and did not disclose that affidavit until the end of April 2020. Consequently, Cuentas filed a motion to strike the affidavit, which the trial court granted.

JPC now contends that the trial court erred, arguing initially that the court's scheduling order never set a deadline for disclosing experts and further arguing that the court failed to properly apply the requirements set forth in *Lee* for determining whether to exclude witnesses who have not been timely disclosed. But we do not find these arguments persuasive.

As to JPC's initial assertion that no expert disclosure deadline exists, the trial court's modified scheduling order states that discovery is to be completed by November 19, 2019, and that dispositive motions—including *Daubert* motions—were to be filed by January 24, 2020. And although the scheduling order does not set a deadline that expressly mentions "experts," it would be a curious thing to set a specific deadline for filing *Daubert* motions, which determine whether expert

testimony is admissible at trial,[62] but not require the parties to disclose such experts prior to that motion deadline.

Furthermore, the trial court properly applied the four factors set forth in *Lee*. First, the court found JPC's explanation for the delay in disclosing Professor Coyle as an expert witness wanting. And while JPC claims it did not anticipate Cuentas's argument that the note's default provisions constituted unenforceable penalties until Cuentas filed its motion for summary judgment, the court noted that there was evidence JPC became aware of this defense as early as August 2019. Regardless, even after Professor Coyle's affidavit was executed on March 2, 2020, JPC still did not disclose him as an expert until nearly two months later when it attached the affidavit to a response motion.

As to the second factor, the trial court found that Professor Coyle's testimony would not have been important because it primarily offered legal opinions about the enforceability of the note's default provisions that had already been argued by JPC's counsel. In fact, the court explained that because the "enforceability of a liquidated-

---

[62] *See generally Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (113 SCt 2786, 125 LE2d 469) (1993) (holding that the trial judge is assigned the task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

damages provision is a question of law for the court[,]"[63] it would be improper for it to rely on Professor Coyle's opinions regarding the very legal issues raised by the case and central to its resolution.[64] Moreover, to the extent Professor Coyle's testimony about industry standards was distinct from his legal opinions, the trial court found that the former could just as easily be proffered by counsel, and thus, was not crucial.

The trial court also found that Cuentas would be prejudiced by JPC's untimely disclosure, noting that consideration of summary judgment would have to be paused to allow Cuentas to depose Professor Coyle, which would in turn more than likely lead to Cuentas hiring its own expert. This would then result in the parties filing *Daubert* motions and possibly additional summary-judgment filings, thus adding considerable delay to already lengthy litigation. And although JPC discounts the trial

---

[63] *Liberty Life Ins. Co.*, 258 Ga. at 809.

[64] *See Miller v. Turner Broadcasting Sys., Inc.*, 339 Ga. App. 638, 643 (1) n.9 (794 SE2d 208) (2016) (noting that the Court would not rely on the expert's testimony to the extent the expert offers conclusions as to the legal questions raised by the case but merely to the extent the expert offers opinions on whether the appellant acted within industry standards).

court's finding that delay can equal prejudice, other courts considering the effect of delay in this context have echoed this same conclusion.[65]

Finally, the trial court found that the exclusion of Professor Coyle was not unreasonably harsh based on the court's need to ensure compliance with its scheduling order. Essentially, the trial court expressed skepticism as to JPC's proffered reasons for the delay in identifying Professor Coyle and did not want to countenance this sort of (suspected) legal gamesmanship. Additionally, the court opined that exclusion was not unwarranted given, again, that Professor Coyle's testimony primarily consisted of legal conclusions that the court would not consider in any event. Given all these circumstances, we cannot conclude that the trial court failed to thoroughly consider the factors established by our Supreme Court for determining whether to exclude an expert witness who has not been timely disclosed

---

[65] *See Geiserman v. MacDonald*, 893 F2d 787, 791 (II) (5th Cir. 1990) (upholding exclusion of expert witness after evaluating the feasibility of other remedies, considering plaintiff's actions in missing two court-imposed deadlines and the potential prejudice that would ensue). In *Lee*, our Supreme Court looked to other jurisdictions for guidance on this issue of first impression in Georgia. *See* 307 Ga. at 823 (3) (explaining that "we look to rulings from other jurisdictions for guidance, as our own case law and Georgia statutes do not directly address all of the specific factors that a trial court should consider" in determining whether to exclude untimely disclosed expert).

or that it misapplied those factors in this instance.[66] Accordingly, in striking Professor Coyle's expert affidavit, the trial court did not abuse the broad discretion it is afforded to establish pretrial scheduling deadlines and other matters of case management.[67]

For all these reasons, we affirm the trial court's summary judgment ruling that the note's Default-Conversion and Make-Whole provisions were unenforceable penalties rather than liquidated damages, but we reverse its ruling that JPC waived the Default-Interest provision as a matter of law. Furthermore, we affirm the court's ruling striking Professor Coyle's expert affidavit.

*Judgment affirmed in part and reversed in part. Mercier and Pinson, JJ., concur*.

---

[66] *See Geiserman*, 893 F2d at 791 (II) (upholding exclusion of expert witness after evaluating the feasibility of other remedies, considering plaintiff's actions in missing two court-imposed deadlines and the potential prejudice that would ensue).

[67] *See supra* note 54 and accompanying text.